FARMERS & MERCHANTS STATE
BANK, an Idaho banking
corporation, Plaintiff–Appellee,

v.

WESTERN BANK, an Oregon banking
corporation, Defendant–Appellant.

Nos. 84–4277, 85–4339.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 10, 1986.

Decided Aug. 19, 1987.

Amended Jan. 11, 1988.

James E. Risch, Boise, Idaho, and Bernard J. Nussbaum, Chicago, Ill., for plaintiff-appellee.

John Whitty, Coos Bay, Or., and John R. Faust, Jr., Portland, Or., for defendant-appellant.

Before SKOPIL, NELSON and BOOCHEVER, Circuit Judges.

NELSON, Circuit Judge:

Western Bank ("Western") appeals from a decision of the district court, holding it liable to Farmers & Merchants State Bank ("F & M") in the amount of $708,133.07 plus interest, costs, and attorney's fees. Both banks were victims of a check-kiting scheme. F & M brought this diversity action to recover from Western the amount of a cashier's check drawn by and on Western, payable to an F & M customer. Western issued the check to F & M in settlement for thirteen checks drawn by a Western customer and presented for payment to Western by F & M. When Western re-fused to honor its cashier's check, F & M filed suit.

We have jurisdiction under 28 U.S.C. § 1291, and reverse.

## FACTUAL BACKGROUND

Beginning in 1980 and continuing through July 1981, OK Livestock ("OK") and Fred Currey were involved in a check-kiting scheme. OK maintained a custodial and fiduciary checking account at F & M's Middleton, Idaho branch. Currey, a cattle broker and occasional employee of OK, maintained a combined checking/savings account at Western's Treasure Valley (Ontario), Oregon branch. Pursuant to the scheme, Currey would write checks to OK in amounts exceeding the balance in his account. Currey would cover his potential overdraft at Western by depositing checks drawn on F & M by OK in amounts exceeding the balance in OK's account. In turn, OK would cover its potential overdraft at F & M by depositing checks drawn on Western by Currey in amounts exceeding the balance in Currey's account.

The scheme was made possible by the time lapse between the deposit of a check at one bank and its presentment for payment at the other, and by the banks' willingness to honor checks drawn on uncollected funds. At first, the amounts of the checks written between OK and Currey were relatively small. However, by July, 1981, Currey and OK were exchanging checks in amounts of approximately $700,000 per day.

F & M's correspondent bank, First Interstate Bank of Idaho, N.A. ("First Interstate"), provided F & M with daily reports showing unusual activity in the deposit accounts of its customers.[1] The "Unusual DDA Activity Report" reported checks paid on a given day that were covered by deposits made on the same day. The "DDA Large Items Report" in part indicated accounts with a high volume of activity. The "Rejected DDA Transaction Register" list-

1. Western's data processing center generated computer reports similar to those received by F & M from First Interstate.

ed items presented but not paid because First Interstate's computer showed insufficient funds (collected or uncollected) in the customer's account at the time of presentment. The OK account appeared on one or more of these reports as a suspect account on nearly a daily basis during June and July of 1981.

During most of the time from the opening of the OK account at F & M in August, 1979, until its closure on July 31, 1981, checks drawn on OK's account were presented for payment on a daily basis in excess of the funds on deposit. It became the practice for OK personnel to call F & M at about mid-day to determine the amount needed to cover checks presented on the account, or for the F & M personnel to call OK to advise of the amount of deposits needed that day. F & M computed the necessary deposit by totaling the OK checks appearing on the Rejected DDA Transaction Register received that day from First Interstate. After OK made the necessary deposit, which usually and primarily consisted of checks drawn on Western by Currey, F & M would instruct First Interstate to pay OK's checks rather than dishonor them. Because F & M did not distinguish between collected and uncollected funds when it honored checks drawn against the OK account, OK was able to operate its account continuously on uncollected funds. For example, on July 31, 1981, the day F & M closed the account, OK's account statement reflected a beginning positive balance of $948,357.00. However, as against collected funds, the OK account was overdrawn by over $1,100,000.00.

On or about June 8, 1981, F & M's Middleton branch manager, Soren Anderson, and F & M's president, Bernard Gratton, met with OK's principal, Ken Troutt, to discuss F & M's concerns about OK's handling of its account. Troutt explained that Currey was lending money to OK on a shortterm basis to cover OK's account during the time lapse between OK's issuance of checks to cattle sellers at OK's weekly cattle auction and OK's receipt of checks from those who purchased cattle at the auction. Anderson said, "Ken, I sure as

hell hope there is not a kite situation going on," and Troutt reportedly assured Anderson there was not. Anderson and Gratton warned Troutt that OK could not continue to operate its account as it had in the past, and that if the account was to remain in the branch, it would be essential that OK not write checks until it had funds on deposit at F & M to cover them.

Nonetheless, after the June meeting, it was still necessary on most days for F & M to notify OK of the amount needed to cover checks presented for payment on its account. F & M's operations officer testified that, under Anderson's supervision, such calls were made on every business day after July 1, 1981. Anderson also personally conducted a daily review of all checks deposited to OK's account and all checks paid out of OK's account.

On July 21, 1981, F & M's Board of Directors decided to close the OK account by month's end. The following day, Anderson wrote to Western to inquire about Currey's financial standing and his ability to handle the volume of transactions he had with OK. In a letter received by F & M on July 29, Western responded that Currey's deposit account maintained an average of a median six-figure balance and was handled in a satisfactory manner. Additionally, on numerous other occasions, Western had confirmed over the telephone that Currey's balance was sufficient to cover particular checks deposited by OK.

After receiving Western's letter, F & M began procedures to close the OK account. On July 29, Gratton told Anderson to honor only OK checks backed by collected funds and to procure cashier's checks in exchange for any Currey checks deposited by OK. Only Currey's checks were singled out for this treatment. F & M's "Rejected DDA Transaction Register" for July 30 reflects that F & M also instructed First Interstate to put a hold on items presented on OK's account.

On July 30, Anderson spoke with OK's office manager, Robert Yensen, who told him that it might be difficult for F & M to close OK's account because of the amount

of float involved in the account. After his conversation with Yensen, Anderson telephoned Bill Mitchell, F & M's Senior Vice-President, and they decided to dishonor all checks in the Middleton branch which had been drawn on the OK account. They also decided that Anderson should attempt to procure a Western cashier's check in exchange for thirteen checks drawn by Currey totalling $708,133.07, which had been deposited by OK earlier that day.

F & M had in its possession $703,634.65 worth of OK checks payable to Currey which had been presented by Western to F & M through normal clearing channels on July 29. At about 6:00 p.m. on July 30, F & M returned these checks unpaid by mailing them to the Salt Lake City branch of the Federal Reserve Bank of San Francisco.

The next morning, Anderson was waiting outside Western's Treasure Valley branch when it opened at 10:00 a.m. He had with him the thirteen Currey checks totaling $708,133.07 which OK had deposited at F & M on July 30. When the bank opened, Anderson went in, identified himself to the teller, and asked to exchange the thirteen Currey checks for a Western cashier's check. The teller examined Currey's account and determined that Currey had made a night deposit of OK checks, also in the amount of $708,133.07. She informed Western's acting operation's officer, Ladeana Ditzler, of Anderson's request and of Currey's night deposit. Ditzler approved the transaction, asked Anderson to endorse the thirteen Currey checks, and gave Anderson a Western cashier's check payable to OK for $708,133.07.

When he returned to F & M, Anderson placed F & M's bank stamp indorsement on the cashier's check and credited OK's account with the entire amount. Later that day, F & M honored two OK checks payable to persons other than Currey and paid out $4,269.86.

At Western, news of issuance of the cashier's check and Currey's night deposit reached Richard Hieb, the bank's central operations supervisor. He ordered a computer history of the Currey account, which was printed within minutes. After reviewing the report, Hieb ordered Charles Rackleff, Western's Treasure Valley branch manager, to return the thirteen Currey checks to F & M and to demand return of the cashier's check.

In the afternoon of July 31, OK's Yensen came to Anderson's office to discuss F & M's closing of the OK account. Yensen confessed to Anderson that OK and Currey had been kiting checks and that there was not enough money in the two accounts to reconcile with both banks. Western's Rackleff arrived at F & M's Middleton branch while Anderson was meeting with Yensen. After Yensen left, Rackleff asked Anderson to give him an F & M cashier's check in exchange for the OK checks totalling $708,133.07, which Currey had deposited at Western the night before. Anderson refused and informed Rackleff that F & M was closing OK's account and would dishonor all of OK's checks payable to Currey until OK's account balance was ascertained. Later in the day, Rackleff telephoned Anderson and demanded the return of the Western cashier's check. When Anderson refused, Rackleff informed him that Western would dishonor its cashier's check.

Thereafter, F & M continued to dishonor all OK checks presented by Western, and Western began to dishonor all Currey checks presented by F & M. When the dust settled, Currey's account at Western was overdrawn by $1,114,021.41, and OK's account at F & M was overdrawn by $1,123,269.51.[2] On October 13, 1981, F & M commenced this action against Western.

## THE DISTRICT COURT'S OPINION

The district court found Western liable to F & M for the amount of the cashier's check, plus interest, costs, and attorney's fees. It concluded that under § 4–213(1) of

2. Had Western honored its cashier's check, OK's account at F & M would have been overdrawn by $415,136.44, and Currey's account at Western would have been overdrawn by $1,822,154.48.

the Uniform Commercial Code ("U.C.C."),[3] Western is accountable to F & M for the amount of the cashier's check because it was issued in final payment for the thirteen Currey checks. The district court construed Article 4 accountability to mean that Western is absolutely obligated to pay F & M the amount of the cashier's check, notwithstanding any defenses Western might have against liability on the thirteen Currey checks.

Second, the district court concluded that since a cashier's check is accepted by a bank upon issuance, Western is also precluded by § 4–303(1) from "stopping payment" on its cashier's check.

Third, the district court found that § 3–418, Article 3's "final payment rule," conflicts with the accountability provision of § 4–213(1). Relying on § 4–102(1),[4] the court held that § 3–418 does not apply in this case. Anticipating the possibility of a contrary ruling on appeal, the district court went on to find that, even if § 3–418 does apply, Western's payment of the thirteen Currey checks was final because F & M took Western's cashier's check as a holder in due course. The district court also held that F & M's holder-in-due-course status made Western's "acceptance" of its cashier's check final under § 3–418.

### ISSUES PRESENTED

I. Does § 4–213(1) render Western liable to F & M for the amount of its cashier's check issued in final payment of the thirteen Currey checks presented by F & M?

II. Is Western precluded by § 4–303(1) from "stopping payment" on its cashier's check because it accepted that instrument upon issuance?

III. Did Western's issuance of its cashier's check constitute an acceptance for the purposes of § 3–418?

IV. Did F & M take Western's cashier's check as a holder in due course?

### STANDARD OF REVIEW

A district court's interpretation of the law of the state in which it sits is subject to de novo review. *In re McLinn,* 739 F.2d 1395, 1397 (9th Cir.1984) (en banc). Its findings of fact may not be disturbed unless clearly erroneous. Fed.R.Civ.P. 52(a); *LaDuke v. Nelson,* 762 F.2d 1318, 1321 (9th Cir.1985), *amended,* 796 F.2d 309 (9th Cir. 1986).

### DISCUSSION

I. *The Meaning of Article 4 Accountability.*

The district court interpreted U.C.C. § 4–213(1) to mean that once a payor bank has "finally paid" items presented for collection, the payor bank is absolutely precluded from asserting any defenses it may have against liability for the items. Pursuant to § 4–213(1),

An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first:
(a) paid the item in cash; or
(b) settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearing house rule or agreement; or
(c) completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith; or
(d) made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing house rule or agreement.

3. Because Western is located in Oregon, the district court applied Oregon law in this diversity action. *See* U.C.C. § 4–102(2) ("The liability of a bank ... with respect to any item handled by it for purposes of presentment, payment or collection is governed by the law of the place where the bank is located.") Oregon has adopted the U.C.C. without any change in the provisions pertinent here. The Code appears at Or.Rev.Stat. §§ 71.1010 through 79.5070.

U.C.C. § 3–418 corresponds to Or.Rev.Stat. § 73.4180, U.C.C. § 4–213 corresponds to Or. Rev.Stat. § 74.2130, and so on. For simplicity, references herein will be to U.C.C. sections.

4. In relevant part, § 4–102(1) provides that "[i]n the event of conflict the provisions of this Article [4] govern those of Article 3."

Upon a final payment under subparagraphs (b), (c) or (d) the payor bank shall be accountable for the amount of the item.

■ We agree with the district court's conclusion that Western "finally paid" the thirteen Currey checks with its cashier's check and is "accountable" to F & M pursuant to § 4–213(1) for the amount of the Currey checks.[5] However, since the time this case was argued and submitted, this court has expressly rejected the view of some courts, including the district court below, that "once a payment is final under [§ 4–213(1)], the payor is liable to the presentor for the face value of the instrument and has no possible equitable action for return of money paid by mistake." *Morgan Guaranty Trust Co. v. American Sav. & Loan Ass'n,* 804 F.2d 1487, 1499 (9th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987). In *Morgan Guaranty,* we found the "better view" to be that finality under § 4–213 has no independent substantive effect, but merely determines when the "final payment rule" of § 3–418 comes into play. *Id.* With exceptions not pertinent here, § 3–418 provides that "payment or acceptance of any instrument is final in favor of a holder in due course, or a person who has in good faith changed his position in reliance on the payment." Nothing in the drafters' comments accompanying § 4–213 suggests that the section was intended to supercede § 3–418 or to cut off the rights of banks to

recover mistaken payments. To so interpret § 4–213 is inconsistent with the drafters' acknowledgment in comments to another Article 4 section that banks retain "common law rights, e.g., to recover money paid under mistake (Section 1–103) in cases where the payment is not made final by Section 3–418." *See* U.C.C. § 4–403 comment 8. Moreover, the comments accompanying § 3–418 expressly acknowledge that the "final payment rule" applies "to the payment of overdrafts, or any other payments made in error as to the state of the drawer's account." *Id.* at § 3–418 comment 2.

Thus, we hold that Western is not precluded from asserting its defenses to liability for the amount of the thirteen Currey checks merely because Western "finally paid" those checks pursuant to § 4–213(1). Rather, § 3–418 governs Western's right to assert its defenses.[6]

II. *Western's Acceptance of its Cashier's Check and the Applicability of U.C.C. § 4–303(1).*

■ In relevant part, § 4–303(1) provides that "[a]ny knowledge, notice or stop-order received by, legal process served upon or setoff exercised by a payor bank" comes too late to terminate "the bank's right or duty to pay an item or to charge its customer's account for the item," if the bank has *"accepted"* or certified the item." [7] (Emphasis added.) Observing that cashier's checks are widely perceived as substitutes for cash, the district court cited *First*

---

5. U.C.C. § 4–211 acknowledges that a collecting bank may take a cashier's check in settlement for items presented for collection. Since F & M and Western were members of and cleared through different clearing houses, F & M's receipt of Western's cashier's check was also a "final settlement" for the 13 Currey checks. *See* § 4–211(3)(b).

6. As set forth earlier, the district court held that if § 3–418 governs Western's liability for items "finally paid" under § 4–213(1), Western is still liable for the 13 Currey checks because F & M took Western's cashier's check as a holder in due course. Since Western "finally paid" the 13 Currey checks, not the cashier's check, the district court erred in its analysis. It should have determined whether F & M took the Currey checks as a holder in due course.

However, F & M has not argued below or on appeal that Western is liable under § 3–418 because F & M took the "finally paid" Currey checks as a holder in due course. Rather, F & M relies on § 3–418 for the analytically distinct proposition that Western's acceptance of its cashier's check is final under § 3–418 because F & M took the cashier's check as a holder in due course. Other than to note that the outcome of this case would be the same had F & M raised the issue, we do not address F & M's holder-in-due-course status with respect to the "finally paid" Currey checks.

7. The full text of § 4–303(1) is as follows:

Any knowledge, notice or stop-order received by, legal process served upon or setoff exercised by a payor bank, whether or not effective under other rules of law to terminate, suspend or modify the bank's right or duty to pay an item

*National Bank v. Noble*, 179 Or. 26, 168 P.2d 354 (1946) (en banc), for its reliance on authority characterizing a cashier's check as "'accepted in advance by the act of its issuance.'" *Id.* at 54, 168 P.2d at 366 (quoting *Polotsky v. Artisans Sav. Bank*, 37 Del. 151, 156–57, 188 A. 63, 65–66 (1936)). Concluding that Western accepted its cashier's check upon issuance, the district court held that § 4–303(1) is "[a]n additional reason [why] Western is not entitled to stop payment on its cashier's check."

Neither § 4–303 nor its accompanying comments mention cashier's checks or suggest that the section was intended to alter the status of such instruments under pre-Code law. Our research reveals a number of pre-Code cases holding that there are circumstances under which a bank may dishonor a cashier's check issued in exchange for a customer's check presented for payment.[8] Indeed, the district court's construction of § 4–303(1) is contrary to the holding of *First National Bank v. Noble*,

the pre-Code Oregon case upon which the district court relied. In *Noble*, the Oregon Supreme Court concluded that a bank's right to recover a cashier's check issued in final payment of a customer's check "must be considered exactly as if the [customer's] check had been paid over the counter in cash." *Id.* 179 Or. at 54, 168 P.2d at 366. The court then held that Restatement of Restitution §§ 33–34 (1937)[9] governed the issuing bank's right of recovery. *Id.* at 69, 168 P.2d at 372. In essence, those Restatement provisions provide that a drawee can recover a mistaken payment unless the holder of the paid instrument possesses attributes analogous to those of a holder in due course under U.C.C. § 3–302(1).[10] While it relied on authority characterizing a cashier's check as accepted upon issuance, the Oregon Supreme Court considered the bank's right to recover its cashier's check just as it would have considered the bank's right to recover cash or a final clearing house settlement. *Noble* offers no support for the proposition that a bank's acceptance

---

or to charge its customer's account for the item, comes too late to so terminate, suspend or modify such right or duty if the knowledge, notice, or stop-order or legal process is received or served and a reasonable time for the bank to act thereon expires or the setoff is exercised after the bank has done any of the following:
 (a) accepted or certified the item;
 (b) paid the item in cash;
 (c) settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearing house rule or agreement;
 (d) completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith or otherwise has evidenced by examination of such indicated account and by action its decision to pay the item; or
 (e) become accountable for the amount of the item under subsection (1)(d) of Section 4–213 and Section 4–302 dealing with the payor bank's responsibility for late return of items.

**8.** *See, e.g., Mine & Smelter Supply Co. v. Stock Growers' Bank*, 200 F. 245, 247–48 (8th Cir. 1912); *National Bank v. Miner*, 167 Cal. 532, 538–39, 140 P. 27, 30 (1914); *Dakota Transfer & Storage Co. v. Merchants Nat'l Bank & Trust Co.*, 86 N.W.2d 639, 644 (N.D.1957).

**9.** Restatement of Restitution § 33 [Mistaken Belief by Drawee as to Duty to Drawer] provides as follows:

The holder of a check or other bill of exchange who, having paid value in good faith therefor, receives payment from the drawee without reason to know that the drawee is mistaken, is under no duty of restitution to him although the drawee pays because of a mistaken belief that he has sufficient funds of the drawer or that he is otherwise under a duty to pay.

Restatement of Restitution § 34 [Duties of Good Faith and Care Owed by Holder of Instrument] provides in pertinent part as follows:

The holder of a bill of exchange or promissory note who, under the rules stated in §§ 30–33, otherwise would be entitled to retain the amount received in payment thereof, is under a duty of restitution to the payor who paid because of a mistake of fact, if
 . . . .
 (b) at the time of payment he suspected or had reason to know of the mistake of the payor. . . .

**10.** Restatement of Restitution §§ 33–34 call for an analysis that is very similar to the treatment of "finally paid" instruments under § 3–418, and the *Noble* court focused on the holder's relationship to the finally paid instrument rather than the cashier's check issued in settlement. However, as we observed, *supra* at note 6, F & M does not contend that Western is liable under § 3–418 for the "finally paid" Currey checks. Rather, F & M relies on § 3–418 for the different proposition that Western's acceptance of its cashier's check is final.

of an instrument absolutely precludes dishonorment.

The comment accompanying § 4–303 notes that the section is a new uniform statutory provision, and we acknowledge that some courts have relied upon § 4–303(1) to prevent a bank from asserting its own defenses against its cashier's check.[11] While these courts justify their holdings as necessary to protect the public perception of cashier's checks as the equivalent of cash, nothing in the U.C.C. suggests that cashier's checks should be treated differently from other instruments subject to Articles 3 and 4. Assuming a bank "accepts" its cashier's check upon issuance, § 3–418 expressly governs the significance of that acceptance. In any event, since Western would have been able to assert defenses available under § 3–418 had it paid cash to F & M in settlement for the thirteen Currey checks, a "cash equivalence" test actually militates against applying § 4–303(1) to absolutely preclude Western from dishonoring its cashier's check.

U.C.C. § 4–303(1) was simply not intended to govern a bank's ability to assert its own defenses to liability on a cashier's check. As have other courts applying § 4–303(1) in this context, the district court triggered the section by characterizing Western's dishonorment of its cashier's check as a "stop payment." However, the reference in § 4–303(1) to a "stop order received by" a bank relates to a customer's effort to stop payment of an item drawn on the customer's account[12] and has no application to an instrument drawn by a bank upon itself.[13] It is apparent from the text of § 4–303 and the accompanying comments that the section was drafted for the purpose of settling the relative priorities of conflicting claims to a *customer's account*,[14] and not for the purpose of cutting off a bank's right to assert its own defenses against an instrument.

Those courts that have applied § 4–303(1) to preclude a bank from asserting its own

11. See, e.g., *Hotel Riviera, Inc. v. First Nat'l Bank & Trust Co.,* 768 F.2d 1201, 1203–04 (10th Cir. 1985) (recognizing that a bank may raise the holder's fraud as a defense, but relying on § 4–303(1) to prevent bank from raising other defenses normally available against one who is not a holder in due course); *Munson v. American Nat'l Bank & Trust Co.,* 484 F.2d 620, 623–24 (7th Cir.1973) (applying § 4–303(1) to preclude a bank from dishonoring cashier's checks, but allowing bank to counterclaim for breach of presentment warranties on instrument used to purchase cashier's checks); *Da Silva v. Sanders,* 600 F.Supp. 1008, 1012–13 (D.D.C.1984) (precluding bank from raising defenses of remitter's fraud and failure of consideration); *First Fin. L.S.L.A. v. First Am. Bank & Trust Co.,* 489 So.2d 388, 391 (La.App.), *writ denied,* 492 So.2d 1217 (La.1986) (precluding bank from asserting defense of failure of consideration after bank mistakenly issued its cashier's check for a customer's check subject to a timely stop order); *Wertz v. Richardson Heights Bank & Trust,* 495 S.W.2d 572, 574 (Tex.1973) (same).

In characterizing a cashier's check as accepted upon issuance, these courts either rely on pre-Code law, as did the district court below, or on U.C.C. § 3–410(1) which defines "acceptance" as "the drawee's signed engagement to honor the draft as presented."

12. U.C.C. § 4–403(1) provides that "[a] customer may by order to his bank stop payment of any item payable *for his account.*" (Emphasis added.) A bank customer thus has no right to stop payment on a cashier's check, which the bank

draws upon itself. Moreover, "customer" is defined at § 4–104(1)(e) to mean "any person having an account with a bank or for whom a bank has agreed to collect items and includes a bank carrying an account with another bank." The phrase after the conjunctive "and" strongly suggests that the drafters did not intend for a bank to be considered its own customer for the purposes of Article 4. Thus, for the purposes of § 4–303(1), it appears inaccurate to characterize a bank's dishonorment of its cashier's check as a "stop order received by" the bank.

13. *See* McDonnell, *Freedom from Claims and Defenses: A Study in Judicial Activism Under the Uniform Commercial Code,* 17 Ga.L.Rev. 569, 615–16 (1983) (arguing that court's which employ the "stop payment" rhetoric "remove the cashier's checks from the Code" by subjecting them to an "independent treatment that the Code drafters did not supply"); *see also* H. Bailey, *Brady on Bank Checks* § 20.12, at 20–30 (5th ed. 1979) (stating that "it would seem that courts which hold flatly that payment [of cashier's checks] may not be stopped are in error" and that "the test should be that of the 'finality of payment' rule of the Code").

14. As explained by Professors White and Summers:

Section 4–303 provides a rule to settle the rights of the holder of a check demanding payment when certain events intervene to prevent payment from the drawer's account. These events, known to the *cognoscenti* as the

defenses against a cashier's check have also failed to appreciate the broader consequences of their reasoning. The language that triggers § 4–303(1) is similar to that which triggers § 4–213(1). In some instances, the bank's "duty to pay" an item under § 4–303(1) arises even sooner than the bank's accountability for an item under § 4–213(1).[15] If acceptance of an instrument precludes a bank from asserting its own defenses, it follows that any other event giving rise to the "duty to pay" under § 4–303(1) should also have the same effect. Such an interpretation of § 4–303(1) results in an even broader abrogation of a bank's common law right to recover mistaken payments than would be the case had we accepted the proposition that § 4–213(1) has such an effect.

### III. *Western's Acceptance of its Cashier's Check and the Applicability of § 3–418.*

The district court also held that Western's "acceptance" of its cashier's check was final under § 3–418 because F & M took the instrument as a holder in due course. We note, however, that there is a divergence of authority on the issue whether a cashier's check is in fact an "accepted" draft under the U.C.C. Some courts have reasoned that because § 3–118(a) provides that "[a] draft drawn on the drawer is effective as a note," a cashier's check should be treated under the U.C.C. as a promissory note rather than as an accepted draft.[16] Other courts have interpreted § 3–413(1)[17] to mean that the U.C.C. imposes equivalent obligations on the maker of a note and the acceptor of a draft, and that it should thus make no difference whether a cashier's check is characterized as a note or an accepted draft.[18] Both of the foregoing groups of courts conclude that U.C.C. §§ 3–305[19] and 3–306[20] govern a bank's ability to assert defenses against liability on a cashier's check. A third group of courts and commentators accepts the characterization of a cashier's check as an ac-

"four legals," include (1) knowledge or notice of the customer's death, incompetency, or bankruptcy; (2) the customer's stop order; (3) legal process (for example, garnishment); (4) setoff by the payor bank.
J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* 692 (2d ed. 1980).

**15.** For example, when a bank has "evidenced by examination of such indicated account and by action its decision to pay the item," that item has priority under § 4–303(1) over the "four legals" even though it has not been "finally paid" under § 4–213(1).

**16.** *See, e.g., TPO Inc. v. Federal Deposit Ins. Corp.,* 487 F.2d 131, 135–36 (3d Cir.1973); *State Bank v. American Nat'l Bank,* 266 N.W.2d 496, 498–99 (Minn.1978) (characterizing bank money order as a note); *Laurel Bank & Trust Co. v. City Nat'l Bank,* 33 Conn.Supp. 641, 644–45, 365 A.2d 1222, 1224 (1976).

**17.** In relevant part, § 3–413(1) provides that "[t]he maker or acceptor engages that he will pay the instrument according to its tenor at the time of his engagement."

**18.** *See, e.g., Rezapolvi v. First Nat'l Bank,* 296 Md. 1, 9, 459 A.2d 183, 188 (1983); *Santos v. First Nat'l State Bank,* 186 N.J.Super. 52, 64–65, 451 A.2d 401, 407 (1982) (but observing that "[t]he purpose of § 3–418 seems unrelated to cashier's checks").

**19.** U.C.C. § 3–305 [Rights of a Holder in Due Course] provides as follows:
To the extent that a holder is a holder in due course he takes the instrument free from
(1) all claims to it on the part of any person; and
(2) all defenses of any party to the instrument with whom the holder has not dealt except
(a) infancy, to the extent that it is a defense to a simple contract; and
(b) such other incapacity, or duress, or illegality of the transaction, as renders the obligation of the party a nullity; and
(c) such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms;
(d) discharge in insolvency proceedings; and
(e) any other discharge of which the holder has notice when he takes the instrument.

**20.** U.C.C. § 3–306 [Rights of One Not Holder in Due Course] provides as follows:
Unless he has the rights of a holder in due course any person takes the instrument subject to
(a) all valid claims to it on the part of any person; and
(b) all defenses of any party which would be available in an action on a simple contract; and

cepted draft and concludes that § 3–418 should control a bank's ability to assert its defenses to liability on the instrument.[21]

While the Oregon Supreme Court in *Noble* favorably quoted authority characterizing a cashier's check as " 'accepted in advance by the act of issuance'," it quoted the same authority for the proposition that such a check " 'becomes the obligation of the issuing bank as much so as if the bank had given a promissory note instead of its check.' " *Noble,* 179 Or. at 54, 168 P.2d at 366. Thus, it is unclear whether the Oregon courts would apply § 3–418 or §§ 3–305 and 3–306 to the facts of this case. However, to resolve the case before us, we need not anticipate how Oregon courts would answer that question. For whether we view Western's cashier's check as an accepted draft or a promissory note, we conclude in the following section that Western is entitled to assert its defenses against liability on its cashier's check.

### IV. *F & M's Status As a Holder in Due Course.*

 U.C.C. § 3–418 makes acceptance of an instrument final in favor of a holder in due course. With exceptions not pertinent here, § 3–305(2) immunizes a holder in due course from "all defenses of any party to the instrument with whom the holder has not dealt." [22] One who lacks holder-in-due-course status takes an instrument subject to all the claims and defenses enumerated in § 3–306, including "all defenses of any party which would be available in an action on a simple contract." *Id.* at § 3–306(b).

> (c) the defenses of want or failure of consideration, nonperformance of any condition precedent, non-delivery, or delivery for a special purpose (Section 3–408); and
> (d) the defense that he or a person through whom he holds the instrument acquired it by theft, or that payment or satisfaction to such holder would be inconsistent with the terms of a restrictive indorsement. The claim of any third person to the instrument is not otherwise available as a defense to any party liable thereon unless the third person himself defends the action for such party.

**21.** *See, e.g., Gates v. Manufacturers Hanover Trust Co.,* 98 A.D.2d 829, 830, 470 N.Y.S.2d 492, 493 (1983); H. Bailey, *Brady on Bank Checks* § 20.12, at 20–30 (5th ed. 1979).

U.C.C. § 3–306(b) is a restatement of the first sentence of section 58 of the Uniform Negotiable Instruments Law ("N.I.L."), which provided as follows:

> In the hands of any holder other than a holder in due course, a negotiable instrument is subject to the same defenses as if it were nonnegotiable.

Or.Rev.Stat. § 71.058 (same as N.I.L. § 58) (repealed 1961); *see* U.C.C. § 3–306 comment 3. It has long been the law of Oregon that "[w]hen the maker of a non-negotiable instrument is sued by an assignee, he may set up as a defense against him any such matter by way of setoff or other defense as he could have set up against his assignor." *Rayburn v. Hurd,* 20 Or. 229, 231–32, 25 P. 635, 636 (1891). "Every assignee of a nonnegotiable chose in action stands in the shoes of his assignor and is in no better position than his assignor when he attempts to enforce it." *First Nat'l Bank v. Morgan,* 132 Or. 515, 527, 284 P. 582, 586 (1930). Under earlier Oregon negotiable instruments law, it was observed that one who did not qualify as a holder in due course took the instrument "subject to all defenses which could be made against the original payee if he were still the holder of it." *Id.* at 526, 284 P. at 586. We thus conclude that Western is entitled pursuant to U.C.C. § 3–306(b) to assert its defenses against OK, the payee of the cashier's check, unless F & M is a holder in due course.[23]

The U.C.C. defines a holder in due course as follows:

**22.** Our decision in this case does not require us to determine whether F & M "dealt" with Western for the purposes of § 3–305(2).

**23.** The Oregon Supreme Court has construed U.C.C. § 3–306(b) in conjunction with a non-U.C.C. statutory provision in Oregon to conclude that "to be available as a defense in an action by a transferee, [the defense] must exist at the time of or before the drawer of a check receives notice of the transfer or assignment of the check, as by deposit in a bank." *Community Bank v. Ell,* 278 Or. 417, 564 P.2d 685, 689 (1977) (en banc); *see* Or.Rev.Stat. 80.020 [Effect of an assignment on a defense] (1985).

A holder in due course is a holder who takes the instrument

(a) for value; and

(b) in good faith; and

(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person. U.C.C. § 3–302(1). Because the requirements set forth in § 3–302(1) are conjunctive, failure to meet any one of the three requirements defeats holder-in-due-course status.

Pursuant to § 3–307(3), a person claiming holder-in-due-course status bears the burden of proving by a preponderance of the evidence that it is "in all respects a holder in due course." *Id.* at § 3–307(3) & comment 1. This burden arises "[a]fter it is shown that a defense exists." *Id.* at § 3–307(3).

Western contends that it has the defenses of fraud, mistake, and failure of consideration against liability on its cashier's check, as well as a right of setoff arising from its status as the holder of millions of dollars in OK checks dishonored by F & M. We need only consider Western's fraud defense. OK and Currey were engaged in a fraudulent check-kiting scheme. Before issuing the cashier's check, Western's employees checked the status of Currey's account, noted that Currey had deposited over $700,000 in OK checks in the night depository, and concluded that there were sufficient funds—albeit uncollected—in Currey's account to cover the thirteen Currey checks presented for payment. Thus, it is apparent that Western issued its cashier's check in reliance on bank balances fraudulently generated by the OK/Currey checkkiting scheme.

F & M argues, however, that Western does not have a fraud defense against OK because it had no right to rely on the uncollected OK checks reflected in Currey's account balance when it issued its cashier's check. F & M cites *Coy v. Starling*, 53 Or.App. 76, 630 P.2d 1323, 1325, *rev. denied*, 291 Or. 662, 639 P.2d 1280 (1981), for the proposition that "the person claiming reliance must have a right to rely upon the representation" and must "use some measure of protection and precaution to safeguard its interests." *Coy*, however, involved an action by plaintiffs seeking monetary damages for an alleged fraud. In rescission actions brought by defrauded plaintiffs, Oregon has "adopted the policy that it is better to encourage negligence in the foolish than fraud in the deceitful." *Johnson v. Cofer*, 204 Or. 142, 149, 281 P.2d 981, 985 (1955). A party who "has, in fact, been induced to enter a contract by an intentional misrepresentation may rescind the contract even though his reliance may have been negligent." *Bodenhamer v. Patterson*, 278 Or. 367, 374, 563 P.2d 1212, 1216 (1977); *See also Heverly v. Kirkendall*, 257 Or. 232, 237, 478 P.2d 381, 383 (1970) (distinguishing possible contrary authority as an "earlier state of the law"). The Oregon Supreme Court has adhered to this same rule when a dishonest plaintiff seeks to enforce a contract against his careless victim. *See Kubeck v. Consolidated Underwriters*, 267 Or. 548, 555, 517 P.2d 1039, 1042 (1974) (applying against a plaintiff the rule that "a fraud-feasor will not be heard to assert that his victim was negligent in relying on his misrepresentations"); *Outcault Advertising Co. v. Jones*, 119 Or. 214, 221, 239 P. 1113, 1115 (1925). We conclude that Western would be entitled under Oregon law to assert its fraud defense had OK, the payee, maintained this action on the cashier's check. Therefore, unless F & M carries its burden of proving that it took the cashier's check as a holder in due course, Western is entitled to assert its fraud defense against liability on the cashier's check

### A. *F & M's Good Faith.*

"Good faith" is defined at U.C.C. § 1–201(19) as "honesty in fact in the conduct or transaction concerned." In applying this definition, "[t]he appropriate standard is a subjective one, looking to the intent or state of mind of the party concerned." *Community Bank v. Ell*, 278 Or. 417, 428, 564 P.2d 685, 691 (1977) (en banc).

The district court found that F & M "was acting in good faith when Anderson drove to Western and asked to exchange the thirteen Currey checks for a cashier's check." However, except for observing that "F & M's computer reports had been warning about the [OK] account" and that F & M was concerned, the district court's assessment of F & M's state of mind consisted almost entirely of a review of Western's conduct in this matter. The court stressed that "Western was responsible for knowing the state of Currey's account," yet had repeatedly "assured F & M that Currey's account was good, with sufficient funds to cover the questioned transaction." Western had also "reassured F & M by letter that Currey's ... account had an average of a six-figure balance which was 'handled in a satisfactory manner.'" The district court concluded that, "[u]nder these facts," F & M had acted in good faith.

We review the district court's finding that F & M acted in subjective good faith for clear error. *See United States v. McConney*, 728 F.2d 1195, 1203, *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed. 2d 46 (1984). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Based on our careful review of the voluminous and detailed record below, we have formed such a "definite and firm conviction" in this case. The district court's analysis of F & M's state of mind was focused almost exclusively on Western's conduct. However, the issue before it was F & M's subjective good faith, not the comparative negligence of the parties. Western's alleged negligence, in and of itself, is irrelevant to F & M's status as a holder in due course. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. City Nat'l Bank*, 628 F.2d 969, 970 (6th Cir.1980) (per curiam). The fact that Western made representations (negligently or otherwise) is certainly a factor bearing on F & M's state of mind when it took Western's cashier's check. However, as explained below, those representations must be viewed in the context of the entire record. We conclude that the district court clearly erred in concentrating on Western's conduct to the exclusion of the numerous facts in the record that, in their totality, convincingly establish that F & M did not carry its burden of proving that it took Western's cashier's check in good faith.

### 1. F & M's Attempt to Shift the Probable Deficit in OK's Account.

The Oregon Supreme Court has twice addressed the issue of a bank's good faith in the context of a check-kiting scheme. In *Community Bank v. United States National Bank*, 276 Or. 471, 480, 555 P.2d 435, 440 (1976), that court concluded that when a bank "had no more than a suspicion of some scheme," such evidence "did not demonstrate bad faith as a matter of law."[24] However, that holding must be read in light of *Community Bank v. Ell*, 278 Or. 417, 564 P.2d 685 (1977) (en banc), the facts of which are strikingly similar to those in the present case. Jones, a Community Bank customer, was financing his wholesale auto business through a "flooring" arrangement with defendant Ell. Because the loans were extended and repaid separately for each individual automobile, a significant portion of Jones' daily bank deposits consisted of checks written by Ell, and a significant portion of the checks writ-

---

24. The case before us involves more than a bank acting promptly on a mere suspicion of check-kiting. The bank in *United States National Bank* suspected a kite and "therefore ... had determined not to make payment on checks drawn on its customer's account until checks deposited in that account ... had been paid." *Id.* at 479, 555 P.2d at 440. The record in this case reflects that F & M suspected a kite by at least June 8, but nonetheless acquiesced and assisted in OK's operation on float, even after it had warned OK to discontinue the practice. *See* B. Clark, *The Law of Bank Deposits, Collections and Credit Cards* ¶ 4.12[1], at 4–69 (1981) ("It should come as no surprise that a depositary bank that takes for collection a check drawn on another bank and allows the customer to withdraw against the uncollected funds cannot qualify as a holder in due course if it suspects that a kite is in progress.")

ten by Jones were payable to Ell. During the period of this financing arrangement, Community Bank permitted Jones to maintain his account in a "potential overdraft" position, just as F & M permitted OK to do with its account. When Community Bank determined that the situation had "the indications of a 'check-kiting' operation in progress," *id.* at 424, 564 P.2d at 689, it notified Ell's bank on the very next banking day that Jones' checks payable to Ell would be dishonored. When Ell responded by stopping payment on four checks that Jones had deposited in his account, Community Bank brought suit, claiming that it took Ell's checks as a holder in due course. On Community Bank's appeal from an adverse verdict, the Oregon Supreme Court held that, because Community Bank knew when it took Ell's checks that Jones' account showed indications of a kite, the trial judge had properly submitted the issue of Community Bank's good faith to the jury:

> In our opinion, the jury could consider this evidence in light of the bank's longstanding practice of permitting Jones to maintain his large potential overdrafts and could have found, based upon all of this evidence, that when Community accepted Jones' deposit of Ell's checks it did not act in good faith, but was attempting to place on Ell the probable loss resulting from Jones' operations, in which the bank had acquiesced.

*Id.* at 428–29, 564 P.2d at 692. On the record before us, we find inescapable the conclusion that F & M's actions were consciously calculated to shift to someone else the probable loss resulting from F & M's longstanding acquiescence and assistance in OK's operation on uncollected funds. When Anderson went to Western on July 31 to obtain the cashier's check, F & M knew that Currey's account balance would reflect the $703,634 in OK checks that F & M had dishonored the evening before, plus another $704,153 in OK checks that appeared on F & M's "Rejected DDA Transactions Register" for July 30.[25] Moreover, since OK had continued to make $700,000 deposits of Currey checks (supposedly representing new "loans") on each day through July 30, F & M had to know that Currey would have also continued to deposit OK checks (representing "loan" repayments) and that his Western account would reflect at least another $1,400,000 in OK checks that were heading to F & M through banking channels.[26] Taking the facts as F & M claims to have understood them,[27] F & M began to dishonor OK's loan repayments to Currey while quickly acquiring Western's cashier's check in exchange for Currey checks that F & M understood to represent new loans to OK. F & M knew Western issued its cashier's check in reliance on Currey's account—an account that F & M itself had already seriously impaired[28] by its own acts of

**25.** The "Rejected DDA Transaction Register" for July 30 reflects that these OK checks presented by Western were rejected, not because of insufficient funds, but because F & M had notified First Interstate to put a hold on OK's account.

**26.** The parties have stipulated that it normally took at least two days for the OK and Currey checks to travel through banking channels between F & M and Western. At his deposition, Soren Anderson testified that F & M knew "there was a lot of float between the two accounts." He also admitted it "would be logical" to assume that, because OK and Currey were making $700,000 deposits each day, there might be as much as $2,000,000 in uncollected funds in each account.

Indeed, the record shows that when Anderson obtained Western's cashier's check, Currey's account balance reflected $2,823,296 in uncollected OK checks. In addition to the $703,634 in OK checks dishonored on July 30, F & M dis-

honored $708,133 in OK checks presented by Western's Ratleff on July 31, and dishonored another $1,411,529 in OK checks presented through normal banking channels on July 31 and August 3.

**27.** According to Anderson, F & M understood that the OK checks presented by Western on July 29, 30, and 31 represented OK's repayment of Currey loans.

**28.** In *Corn Exchange Bank v. Tri–State Livestock Auction Co.,* 368 N.W.2d 596, 600 (S.D.1985), the South Dakota Supreme Court observed that "[i]t is the impaired nature of the drawer's situation or his instrument that the holder must have some foreknowledge of in order to establish bad faith." F & M knew Currey's "situation" was seriously impaired by its decision to dishonor OK's checks. It cannot overcome the effect of that knowledge by merely exchanging Currey's checks for Western's cashier's check.

dishonorment and that F & M knew reflected millions of dollars in additional OK checks which F & M did not intend to honor.[29] F & M's actions on July 30 and July 31 were clearly designed to shift any shortfall in OK's account to Currey, or to Western in the very likely event that Currey's account proved insufficient to cover Western's cashier's check after F & M dishonored the OK checks then reflected in Currey's account. We do not believe that a bank engaging in such conduct has exhibited the "honesty in fact" required of a holder in due course.[30]

The district court emphasized that "Western was responsible for knowing the state of Currey's account," and had represented to F & M that Currey "maintained an average of a six-figure balance." However, F & M knew better than Western that Currey's account reflected a seven-figure balance of OK checks that F & M had either dishonored or intended to dishonor. Western did not represent that Currey's account contained a median six-figure balance of collected funds,[31] and given that F & M was aware of the millions of dollars in float between the two accounts, we find it hard to believe that F & M would so conclude. Even if F & M thought that Currey's account contained collected funds, its tactic of dishonoring OK's checks payable to Currey while quickly collecting on Currey's checks payable to OK was intended to exhaust Currey's account of any available good funds and to shift to Western the shortage that was likely to materialize as F & M closed OK's account.

The only question before us is whether F & M should be entitled to enjoy the elevated status of a holder in due course. The relative diligence of F & M and Western in discovering the check-kiting scheme is not relevant to that inquiry. Given F & M's longstanding suspicion of a kite, its continued acquiescence in OK's handling of its account, its awareness of the volume of float between the OK and Currey accounts, and its own knowledge of and participation

**29.** Anderson testified that, on July 30, the decision was made to dishonor all further OK checks payable to Fred Currey. As noted earlier, F & M's "Rejected DDA Transaction Register" reflects that F & M put a hold on OK's account on July 30.

**30.** In *Community Bank v. Ell,* the Oregon Supreme Court also observed that Community Bank "made no inquiries of Ell" before dishonoring Jones' checks. 278 Or. at 428, 564 P.2d at 692. In this case, F & M did inquire of Western as to whether Currey's checks would clear. However, those inquiries do not alter our finding that F & M acquiesced in OK's operation on float for months, notwithstanding its suspicions of a kite, then acquired Western's cashier's check in an eleventh hour effort to shift the probable deficit in OK's account to Currey or Western.

Analogous facts were presented in *Oklahoma National Bank v. Equitable Credit Finance Co.,* 489 P.2d 1331 (Okla.1971), relied upon in *Community Bank v. Ell* as a case in which "similar bank practices [were] held to be evidence of bad faith." 278 Or. at 429 n. 10, 564 P.2d at 692 n. 10. In that case, defendant Equitable had been factoring the receivables of Goodrich Industries, a customer of Oklahoma National Bank ("Bank"), *and the amount of Equitable's advances had climbed to $45,000 per day.* Although aware that Goodrich was under-financed, the Bank allowed Goodrich to maintain its account in a "potential overdraft" position and knew that Goodrich was repaying Equitable's loans, not with collected receivables, but with Equitable's new advances. When the Bank eventually stopped payment on Goodrich's checks, then sued Equitable to recover on checks deposited by Goodrich, the Oklahoma Supreme Court found that the Bank had not acted in good faith. While the Bank's officers had been concerned about Goodrich's account, they had been "primarily interested in determining that Equitable's checks ... would clear" and were "not concerned about the possibility that Goodrich was defrauding Equitable." *Oklahoma Nat'l Bank,* 489 P.2d at 1334.

Similarly, F & M knew that OK was covering its "loan" repayments to Currey, not with collected receivables, but by depositing new Currey advances to its account. However, rather than being concerned about the manner in which OK was repaying the Currey advances, F & M was primarily interested in determining that Currey's checks would clear.

**31.** During the period from July 22 to July 29, OK's account at F & M also reflected a median six-figure positive balance. At his deposition, Anderson testified that, during July, "there were positive balances in the [OK] account most of the time," and, as a result, the OK account was called to his attention less often than in earlier months. Inasmuch as Anderson was taking uncollected funds into account in assessing OK's positive balance, it is unclear why he would have jumped to the conclusion that Western's letter referred to collected funds.

in the impairment of the Currey account, we conclude that F & M is not the type of innocent holder which the holder-in-due-course doctrine is intended to protect.[32]

### 2. *F & M's Conscious Failure to Make Inquiries.*

While mere negligence does not normally affect the finality of a payment or acceptance, the comments to § 3–418 expressly acknowledge that there may be circumstances in which "negligence amounts to a lack of good faith." U.C.C. § 3–418 comment 4. In *Community Bank v. Ell,* the Oregon Supreme Court observed that "if a party fails to make an inquiry for the purpose of remaining ignorant of facts which he believes or fears would disclose a defect in the transaction, he may be found to have acted in bad faith." 278 Or. at 428, 564 P.2d at 691. If F & M's officers were in fact unaware that OK and Currey were kiting checks, it was only because they consciously ignored the abundance of facts in the record that would have alerted them that a kite was under way.[33]

OK's account was the largest and most active account at F & M's Middleton branch. Because of its size in relation to the size of the branch, and because of the size and frequency of deposit and withdrawal activities in the account, it had been singled out as a "problem account" in reports prepared by F & M's independent auditors, as well as in the reports of auditors of the Federal Deposit Insurance Corporation and the Idaho Department of Finance.

F & M's operations and procedures manual identified eight "signs" of kiting and warned that "[a]s these signs continue to appear or grow in number, it is almost certain that a kiting operation is in process." Five of the eight enumerated signs are as follows:

(1) Regular or frequent deposits of checks drawn by the same maker.

(2) Deposits consistently increasing in size.

(3) Frequent requests for balance of account.

(4) Statement showing large debits and credits but small balance.

(5) Continuous drawing against uncollected funds.

The facts in the record indicate that OK's account had clearly exhibited each of the foregoing "signs" of a kite:

(1) Soren Anderson testified that, by no later than early June, 1981, he had observed that OK and Currey were exchanging checks in almost equal amounts on a daily basis, and that OK was repaying Currey's "loans" on almost the same day that they were made or on the next day.

(2) The DDA Large Items Reports that F & M received from First Interstate reflected that OK's daily deposit of Currey checks had been consistently increasing in size.

(3) It had become the established practice for OK personnel to call F & M each day to determine the amount of deposits needed to cover checks presented on the account, or for F & M personnel to call OK to advise of the amount of deposits needed that day. F & M had made such calls to OK every day in July.

(4) In June, 1981, F & M's comptroller had alerted other F & M officers that OK's maintenance of its account in a perpetual state of potential overdraft was costing the

---

**32.** As observed by the New Jersey Supreme Court in *Unico v. Owen,* 50 N.J. 101, 109–10, 232 A.2d 405, 410 (1967):

The basic philosophy of the holder in due course status is to encourage free negotiability of commercial paper by removing certain anxieties of one who takes the paper as an innocent purchaser knowing no reason why the paper is not as sound as its face would indicate. It would seem to follow, therefore, that the more the holder knows about the underlying transaction, and particularly the more he controls or participates or becomes involved in it, the less he fits the role of a good faith purchaser for value.

**33.** Indeed, early on in its opinion, the district court observed that "[i]t is easy in a case like this to look back and wonder why no one saw the fall coming. In hindsight it appears there was sufficient warning." Anderson himself testified that "I must have been awfully dumb in not recognizing the fact that there was a kite, indeed, going on."

bank from $5,000 to $8,000 in interest income each month. Prior to that time, OK actually had been operating its account on a negative balance because F & M systematically was carrying checks presented on OK's account for a full day before OK deposited funds necessary to cover the items.

(5) The DDA Rejected Transaction Register reflected that OK had been continuously drawing against uncollected funds throughout 1981.[34]

Edith Calhoun, F & M's cashier, testified that she occasionally saw the DDA Rejected Transaction Register for the Middleton branch and was alarmed by the number of times that OK appeared on the reports. When she communicated her concern to Bernard Gratton, he advised her that "they were taking care of the account and that [she] should not worry about it." Calhoun also expressed her concern to Anderson, who responded with similar assurances.

OK had explained to F & M that Currey's loans were necessary to cover OK's account because some of OK's larger customers did not pay for purchases made at the Thursday cattle auctions until the following Wednesday.[35] By July, however, OK and Currey were exchanging $3,500,000 in checks every week. Anderson testified that he knew OK's weekly sales volume was not more than $1,500,000 and that he should have realized OK and Currey were exchanging checks in an amount that exceeded OK's sales volume by $2,000,000. Moreover, we fail to see how F & M could have accepted OK's six-day delay in collecting on some auction accounts as a plausible explanation of why OK and Currey were exchanging $700,000 in checks every day.

Furthermore, our review of the record reveals that OK's auction volume had been nowhere near $1,500,000 for as far back in time as the record permits inquiry. According to reconciliation statements reflecting OK's custodial account activity, OK's average gross receipts at its auctions in May, June, and July of 1981 had been $371,000, with a high of $542,000 on May 7, and a low of $228,000 on July 30. On July 23, one week before F & M closed OK's account, OK's auction sales volume was $233,000, with $42,000 in cash sales deposited to OK's account on July 24.[36] Thus, during the course of the next week, ostensibly to provide OK with "short-term financing" for its $181,000 in receivables, Currey "loaned" and OK "repaid" over $3,500,000, an amount fifteen times greater than OK's July 23 auction volume and almost twenty times greater than OK's supposed "short-term financing" needs.

In the face of this gross disparity between OK's explanation of its dealings with Currey and the actual volume of auction activity cycled through OK's account, F & M's only concern was with whether Currey's checks deposited by OK would clear. *Cf. Oklahoma Nat'l Bank*, discussed *supra* at note 31. F & M's problem, however, was with *OK's account*, not Currey's account. Anderson personally conducted a daily review of all checks deposited to and all checks paid out of OK's account. It should have been patently apparent from that review that the volume of OK's "loan" repayments to Currey vastly exceeded OK's deposits of collected receivables and that OK would have no independent means of covering his checks payable to Currey once F & M ceased extending OK immediate credit on Currey's own drafts. Even if Currey had been legitimately financing

---

**34.** By June 8, the OK account had appeared on the Rejected DDA Transaction Register 99 times, the maximum number of appearances that First Interstate's computer could report in the two-digit column alloted in the Register.

**35.** According to F & M's Anderson, he understood that that each Currey check represented a loan to OK for an individual lot of cattle purchased on credit at the Thursday auction. As OK received payment for these individual lots of cattle from the cattle buyers, it would issue

checks to Currey in repayment of the Currey loans on the individual lots.

**36.** Anderson testified that OK customarily made a large deposit each Friday of payments by cattle buyers at the Thursday auction. Thus, F & M knew that some cattle buyers paid for their auction purchases immediately and that OK's auction receivables supposedly financed by Currey's "loans" were even less than the gross auction sales volume.

OK's receivables, his account at Western perpetually reflected millions of dollars in fictitious balances as a result of F & M's acquiescence in OK's operation on float, including $2,800,000 in fictitious balances on July 31 when F & M obtained Western's cashier's check.

While F & M argues that it relied on Western's assurances to conclude that Currey's account contained good funds, we fail to see how that contention advances F & M's burden of demonstrating its subjective good faith. F & M had long permitted OK to finance its operations and its "loans" from Currey almost entirely on float generated by Currey's own drafts. Under the facts as F & M claims to have understood them, it dishonored millions of dollars in OK's loan repayments to Currey while quickly collecting on Currey checks representing new loans to OK. That strategy was designed to shift the consequences of F & M's own careless banking practices to someone else.

From the record before us, we can only conclude that F & M's officers, perhaps motivated by the desire to keep their largest account in the bank, simply chose for months on end to ignore the ample evidence before them that a kite was in progress.[37] That F & M finally took actions to close the account—actions that were calculated to shift the potential shortfall in OK's account to someone else—does not alter our analysis.

### B. *F & M's Notice of Claims or Defenses.*

A holder in due course must also take an instrument "without notice ... of any defense against or claim to it on the part of any person." The definitional cross-references following § 3–302 direct the reader to § 1–201(25) for the definition of "notice." That section provides:

> A person has "notice" of a fact when (a) he has actual knowledge of it; or (b) he has received a notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question he has *reason to know* that it exists.

U.C.C. § 1–201(25) (emphasis added). Thus, while the standard for determining a holder's good faith is a subjective one, the test for whether a holder has "notice" of defenses against the instrument includes an objective inquiry into "what a reasonable person in the holder's position would know." *Valley Nat'l Bank v. Porter*, 705 F.2d 1027, 1029 (8th Cir.1983); *accord Merrill Lynch, Pierce, Fenner & Smith, Inc. v. City Nat'l Bank*, 628 F.2d 969, 970 (6th Cir.1980) (per curiam).[38]

Without any discussion of § 1–201(25), the district court disposed of the "notice" issue by merely concluding that "[t]he preceding discussion of good faith includes all of the facts and reasons for ... finding that F & M meets the [notice] requirement of a holder in due course." Thus, the district court erroneously appears to have applied only a subjective standard in assessing whether F & M had notice of Western's defenses against the cashier's check.

F & M's officers had long been seriously concerned about OK's account and had suspected for several months that OK and Currey might be kiting checks. F & M received reports from numerous sources that characterized OK's account as a problem or suspect account. These reports alerted F & M to the fact that OK's account reflected numerous "signs" of kiting set forth in F & M's own operations and procedures manual. Moreover, OK's expla-

---

**37.** F & M also contends that, pursuant to § 3–418, Western is liable on its cashier's check because F & M in good faith changed its position in reliance on Western's issuance of the instrument. Assuming arguendo that § 3–418 affords protection to a person who relies in good faith on the acceptance of an instrument, our finding that F & M failed to establish its good faith disposes of this claim.

**38.** U.C.C. § 1–201(25)(c) actually mandates a two-step analysis. First, the subsection requires a subjective determination of "all the facts and circumstances known" to the person seeking holder-in-due-course status. Second, it requires an objective determination of what other facts the person had "reason to know" because of his or her subjective knowledge. *See* W. Hawkland & L. Lawrence, 4 *U.C.C. Series* § 3–304:05, at 420–21 (1984).

nation of its dealings with Currey was grossly inconsistent with OK's sales volume and OK's collection practices. Given F & M's close daily monitoring of OK's account activity and the level of concern expressed by numerous of its officers, it appears to us that F & M knew or had reason to know that a kite was in progress when it obtained Western's cashier's check.

F & M vigorously contends that it was entitled to rely on Western's assurances respecting Currey's account to conclude that OK and Currey were not kiting checks. It argues that it reasonably interpreted Western's letter to mean that Currey maintained an average six-figure balance of *collected* funds in his account.[39] We note, however, that numerous F & M employees testified at deposition respecting F & M's own check payment practices, and they drew no distinction between collected and uncollected funds. And in early June, when F & M confronted OK about its potential overdrafts, F & M's officers only insisted that OK maintain a positive uncollected balance in its account if it was to continue banking at F & M. Moreover, Western's representations did not negate the fact that OK and Currey were daily exchanging $700,000 in checks. In order to maintain a medium six-figure collected balance, it would have been necessary for Currey to maintain a medium seven-figure

positive balance in his account.[40] Thus, we find it hard to believe that F & M could have reasonably leaped to the conclusion that Western's letter was referring to collected funds.

Moreover, even if F & M was entitled to believe that Currey's account contained collected funds, F & M could not have relied on that fact to resolve its concerns about OK's account. Even if, as F & M claims to have believed, Currey was financing OK's receivables and maintained collected balances in his account, it should have been apparent that OK was defrauding *someone*. OK was systematically covering his drafts to Currey with Currey's own drafts rather than with collected receivables, and OK had no apparent means of covering his millions of dollars in outstanding checks once F & M put a stop to his operation on float. *Cf. Oklahoma Nat'l Bank*, discussed *supra* at note 31. If Currey had been a fraud victim and his account had nonetheless proved sufficient to cover the thirteen Currey checks presented by F & M on July 31, he would have had a "claim" to the cashier's check for the purposes of U.C.C. § 3–302(1)(c).[41] Thus, Western's representations about Currey's account at best only raised some doubts as to whether OK and Currey were kiting checks or whether OK was defrauding Currey. In

---

**39.** While F & M had permitted OK to maintain its account in a state of potential overdraft until July, the record reflects that Currey generally had maintained a medium six-figure positive balance of uncollected funds in his account during June and July. And in July, Currey's account reflected a positive seven-figure balance about half the time.

**40.** On July 31, Currey's account at Western contained over $2,800,000 in uncollected OK checks. Thus, Currey would have needed at least a $3,500,000 positive balance in order to pay the 13 checks presented by F & M out of collected funds. Currey would have needed an even higher balance if his account balance reflected uncollected checks drawn on other sources.

**41.** Since the cashier's check was issued in final payment of Currey's checks fraudulently acquired by OK, Currey would have been entitled to recover the instrument in a restitution action unless it reached the hands of a holder in due course. *See* U.C.C. § 3–306 comment 2 (defining "claims" to include "all liens, equities or

other claims of right against the instrument or its proceeds"); *Suitter v. Thompson*, 225 Or. 614, 358 P.2d 267, 273 (1960) (observing the general rule that when legal title to property has been obtained through actual fraud, " 'equity impresses a constructive trust on the property ... in favor of the one who is truly and equitably entitled to the same, although he may never perhaps have had any legal estate therein' ") (quoting J. Pomeroy, 4 *Equity Jurisprudence* § 1053, at 119 (5th ed. 1941)); W. Britton, *Bills & Notes* § 155, at 737 (1943) ("An equity of ownership in an instrument may arise where it is purchased, by a person other than the equity owner, with money or property belonging to such equity owner. Such transactions might assume the form and substance of ... [a] constructive or other form of implied trust."); Chafee, *Rights in Overdue Paper*, 31 Harv.L.Rev. 1104, 1110 (1918) ("A person who never had title to a bill or became a party to it may have an equitable claim to its ownership because ... it was wrongfully bought with his money.")

either case, F & M should have known that there would be a claim to or defense against Western's cashier's check.

We also note that resolution of the notice issue is not necessary to our holding that F & M is not a holder in due course. On the analogous facts presented in *Community Bank v. Ell,* the Oregon Supreme Court upheld the trial court's submission of the good faith issue to the jury even though it also held that, as a matter of law, defendant Community Bank took Ell's checks without notice of any defenses against them. *See Ell,* 278 Or. at 417, 564 P.2d at 692. Given F & M's longstanding acquiescence and participation in OK's operation on float, and in light of F & M's subjective understanding of the OK/Currey transactions, we have already concluded that F & M failed to establish that it took Western's cashier's check in good faith.

## CONCLUSION

In summary, we conclude that Western's liability for an instrument "finally paid" under U.C.C. § 4–213(1) should be resolved by reference to the "final payment rule" of § 3–418. Section 4–303(1) has no bearing on the question whether Western may assert its own defenses to liability on its cashier's check. And whether we apply § 3–418 or §§ 3–305 and 3–306 to the facts before us, we conclude that Western is entitled to assert its defenses against its cashier's check because F & M has failed to carry its burden of proving it took the cashier's check in good faith and without notice of claims or defenses against the instrument. Western has established that it has defenses against its cashier's check and is therefore not liable to F & M for the amount of that instrument. The district court's judgment, including the award of attorney's fees, is reversed.

REVERSED.