COMMUNITY BANK, *Respondent,*
*v.*
UNITED STATES NATIONAL BANK OF OREGON,
*Appellant.*

555 P2d 435

*Richard M. Botteri,* Portland, argued the cause for appellant. On the briefs were Charles F. Hinkle and Gregory R. Mowe, of Davies, Biggs, Strayer, Stoel and Boley, Portland.

*Ferris F. Boothe,* of Black, Kendall, Tremaine, Boothe & Higgins, Portland, argued the cause and filed the brief for respondent.

Before Denecke, Chief Justice, and O'Connell, Holman, Tongue, Howell and Bryson, Justices.

DENECKE, C.J.

## DENECKE, C.J.

This is an action for damages for wrongful failure to pay six checks totaling $93,560. The trial court, sitting without a jury, entered judgment for plaintiff. We reverse and remand for further proceedings.

The checks in question were drawn on defendant United States National Bank (U.S.) and were received by plaintiff Community Bank as deposits from its customers. Community, in the normal course of its operations, delivered the checks, together with others drawn on U.S., to the head office of U.S. in Portland on December 17, 1973. During the night of December 17, these checks were processed by U.S. through its central computer. On the morning of December 18, they were delivered to the branch account service center of U.S. for filing to U.S.'s customers' individual accounts. That same day, before the checks had been filed, U.S. received and honored orders to stop payment on them. Community was duly notified, and this litigation followed. The issue is whether U.S., under the relevant provisions of Oregon's version of the Uniform Commercial Code, was entitled to honor the stop payment orders, or whether it had already become liable to Community to make payment on the checks.

The parties disagree about the controlling statute. Community contends that the case is governed by ORS 74.3030(1). It provides that a stop order received by a payor bank (U.S. in this case) "comes too late" to affect the bank's "right or duty to pay an item or to charge its customer's account for the item" if it is received after the bank has done any one of several things, including:

> "(d) Completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith or otherwise has evidenced by examination of such indicated account and by action its decision to pay the item."

U.S. contends that the governing statute is ORS 74.2130(1). It provides that a payor bank "shall be accountable" for an item upon "final payment." It also

[ 473 ]

provides that an item is finally paid when the payor bank has done any one of several things, including:

> "(c) Completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith."

For purposes of this case it is not necessary to decide which statute governs the rights of the parties. The only question is whether U.S., when it received and decided to honor its customers' stop payment orders, had "completed the process of posting" the checks. Community has not contended that U.S. had evidenced, in any manner other than the completion of the posting process, a decision to pay these checks. Regardless of whether under other circumstances the time when a payor bank becomes "accountable" for a check under ORS 74.2130(1) may differ from the time when a stop payment order "comes too late" under ORS 74.3030(1), for present purposes the issue is the same under either statute. Both the identity of language in the two provisions and the Official Comments to UCC 4-303 (ORS 74.3030) indicate that the phrase "completed the process of posting" means the same thing in both statutes.[1]

---

[1] Comment 2 to UCC 4-303 reads:

"The rule is that if any one of several things has been done to the item or if it has reached any one of several stages in its processing at the time the knowledge, notice, stop-order or legal process is received or served and a reasonable time for the bank to act thereon expires or the setoff is exercised, the knowledge, notice, stop-order, legal process or setoff comes too late, the item has priority and a charge to the customer's account may be made and is effective. Certain of the tests determining the priority status of the item are the same as for final payment under Section 4-213(1), but additional tests apply in the context of the present section. The first event mentioned, namely, acceptance, means formal acceptance as that term is used and defined in Section 3-410. Certification is the type of certification defined in Section 3-411. Payment of the item in cash under Section 4-213(1)(a), final settlement for the item under Section 4-213(1)(b) and completion of the process of posting under Section 4-213(1)(c) all constitute final payment of the item and confer priority. After a cash payment, final settlement or the completion of the process of posting, any knowledge, notice, stop-order, legal process or setoff comes too late and cannot interfere with either the payment of the item or a charge to the customer's account based upon such payment."

Oregon's version of the Uniform Commercial Code, which was enacted in 1961, contains no definition of the phrase "process of posting." In 1962, UCC 4-109 was added to the Official Text of the Code, but has not been adopted in Oregon. UCC 4-109 provides:

"The 'process of posting' means the usual procedure followed by a payor bank in determining to pay an item and in recording the payment including one or more of the following or other steps as determined by the bank:

"(a) verification of any signature;
 (b) ascertaining that sufficient funds are available;
 (c) affixing a 'paid' or other stamp;
 (d) entering a charge or entry to a customer's account;
 (e) correcting or reversing an entry or erroneous action with respect to the item."

The Official Comments to this section give no express reason for the addition of this definition to the Code. However, the Permanent Editorial Board did discuss the background of the adoption of UCC 4-109:

"In California the practice is fairly common for payor banks to charge or 'post' items to customers accounts first and then to verify signatures and determine whether there are sufficient funds later. If it is determined not to pay an item, either due to a defective signature or because of insufficient funds or for some other reason, reversing entries are made in the customer's account. Because of such practices, California bankers have been fearful that the 'completed the process of posting' test in subparagraph (c) would result in premature final payment of items. * * *.

"* * * If the original charge to a customer's account is provisional, subject to later verification of signatures, checking of balances and other tests, the process of posting is not completed until these tests have been made. * * *. In its present form subparagraph (c) is adequate to cover satisfactorily the 'post first-verify later' practice without prematurely paying items, but to remove all doubt on this score the Editorial Board has already approved, as a part of the Official Text, Section 4-109." Permanent Editorial Board for the Uniform Commercial Code, Report No. 2, 80-81 (1965).

These comments indicate that the addition of UCC 4-109 was not intended by the Board to make a substantive change in the Code's provisions which refer to the completion of the process of posting. Rather, the Board was of the opinion that the "process of posting" language was itself broad enough to include whatever procedures a particular bank had adopted for its internal accounting purposes, without necessarily committing the bank to final payment of a check once a deduction from a customer's account had been made during the bookkeeping process.

■  Because we have found no indication that UCC 4-109 was intended to change the meaning of the Uniform Commercial Code as adopted by our legislature, but only to remove possible doubts, we may look to that section for guidance in determining the phrase "process of posting" although the definition has not been made a part of our statutes.[2] Under that section, whether U.S. had completed the process of posting the checks involved in this case depends upon the "usual procedure followed by [U.S.] in determining to pay an item and in recording the payment * * *" and whether the appropriate steps in that procedure had been completed. We summarize, then, the evidence concerning the usual procedures of U.S.

Each night U.S. runs through its central computer all checks which are drawn on its various Portland area branches. The central computer run results in the checks being charged to the individual customers'

---

[2]See *Gibbs v. Gerberich,* 1 Ohio App2d 93, 203 NE2d 851 (1964); *Clarkston v. Bridge,* 273 Or 68, 539 P2d 1094 (1975). We do not, however, "adopt" the language of UCC 4-109 in its entirety. Subparagraph (e) of that section, which is not relevant to this case, has been the subject of an interpretation which has been severely criticized. *See West Side Bank v. Marine Nat'l Exchange Bank,* 37 Wis2d 661, 155 NW2d 587 (1968), and the discussions of that case in Rohner, *Posting of Checks: Final Payment and the Four Legals,* 23 Bus Law 1075 (1968); Comment, *Final Payment and the Process of Posting Under the Uniform Commercial Code,* 68 Col L Rev 349 (1968); Malcolm, *Reflections on West Side Bank: A Draftsman's View,* 18 Cath U L Rev 23 (1968). By our decision in this case, we indicate no opinion on the merits of that case, or of the proper interpretation or application of UCC 4-109(e).

accounts, and produces a number of reports or print-outs. These reports include a balance printout for each branch, summarizing the total activity and the resulting balance in each affected checking account at that branch. The computer run also produces a report showing which accounts are overdrawn, and another report listing those accounts which require examination or special handling because of prior stop payment orders or for other reasons which have been included in the computer's programming. However, the computer does not reject any check from the processing because of potential overdraft or the possibility of a stop payment order. All checks are deducted from the appropriate accounts at this stage. Before leaving the computer center the checks are also sorted according to branch, microfilmed, and stamped "processed." The checks drawn on area branch banks are then sent to the branch account service center on the morning following the computer run. During the day the accounts for which the overdraft and other reports indicate possible problems are examined and decisions are made whether to pay specific checks. If it is determined not to pay a particular check, a reversing entry is made through the computer, correcting the individual account balance. Also during that day the checks are filed to the individual accounts.

The parties' briefs indicate agreement that U.S.'s usual procedures include substantially the steps we have summarized. U.S. contends, however, and presented evidence that before the checks are filed to the individual accounts, all checks in the amount of $1,000 or more are visually examined for irregularities in form and for errors in computer-coding the amount of the check, and that the signatures on such checks are verified by a comparison with the signature card which is attached to the individual account filing tray. All of the checks involved in this case are for more than $1,000. None had been examined for verification of signatures or filed in the individual account trays when the stop payment

orders were received. Whether U.S. had completed the process of posting these checks depends, therefore, upon whether its usual procedure in determining to pay them would have included a visual examination for signature or other possible irregularities prior to filing.

The trial court did not make a finding of fact on this issue. It did enter a "finding of fact" that U.S. had "completed the process of posting each of the said checks to the indicated account of the drawers * * * at the conclusion of its computer processing operations * * *." Although requested to do so by U.S., the trial court did not make an express finding on the credibility of the evidence of U.S. That evidence was that under its normal procedures these checks, prior to filing, would have been visually examined and the signatures verified for purposes of determining whether there was any reason not disclosed by the computer run why the checks should not be paid.

■■ The trial court's finding which we have quoted above necessarily involves a construction of the statutory term "process of posting" which, as a conclusion of law, is subject to review by this court. *Bernard v. First Nat'l. Bank,* 275 Or 145, 550 P2d 1203 (1976). As we construe the statutes involved in this case, their proper application depends upon whether the usual procedures of U.S. in posting checks for amounts greater than $1,000 included any procedures to which these checks had not yet been subjected in which a decision to pay or not to pay would be involved. We cannot determine from the trial court's findings and conclusions whether the trial court did not believe U.S.'s evidence that there was such a step in the process yet to be performed as to these checks, or whether the court believed U.S.'s evidence but nevertheless concluded as a matter of law that the process of posting these checks was completed at the conclusion of the computer run. The case must be

remanded for further findings of fact, and for entry of the appropriate judgment based upon those findings.[3]

■  U.S. contends that the evidence of its normal visual examination procedures is uncontroverted, and urges us to exercise our power under Art VII, § 3 of the Constitution to enter judgment in its favor. This is not an appropriate case for the exercise of that power. Although U.S.'s evidence of its procedures is not contradicted, Community has not conceded that that evidence may be believed. Community argues that it is at least doubtful, given the large number of items processed through U.S.'s Portland branches each day, that U.S. employees really do routinely examine all checks over $1,000, or exercise any judgment as to payment at the time of filing the checks. Although there is evidence of similar procedures at other banks, all the testimony describing U.S.'s procedures was that of its own employees. In spite of the lack of contrary evidence, the question of credibility is a legitimate one and must be resolved by the trial court as trier of fact. *Wattenburg v. United Medical Lab.,* 269 Or 377, 384, 525 P2d 113 (1974); *Rickard v. Ellis,* 230 Or 46, 52, 368 P2d 396 (1962).

As the case must be remanded, we deal briefly with two additional assignments of error. The trial court rejected U.S.'s affirmative defenses that Community acted in bad faith in presenting the checks to U.S. for payment, and that Community should be estopped to bring this action as to one of the checks by a prior judgment. This action is assigned as error. We conclude both assignments are not well founded.

■  On the question of bad faith, there was evidence that Community suspected one of its customers of a "check-kiting" operation which might also involve U.S. customers. Community, therefore, had determined not to make payment on checks drawn on its customer's account until checks deposited in that

---

[3] *Briscoe v. Pittman,* 268 Or 604, 522 P2d 886 (1974); *Andersen v. Wasco Scaffold & Equip.,* 259 Or 100, 104, 485 P2d 1091 (1971).

account, including those involved in this case, had been paid. U.S. contends that Community should have informed U.S. of its suspicions, and that its failure to do so was conclusive evidence of bad faith. The trial court, however, was entitled to believe Community's evidence that at the time these checks were presented to U.S. for payment it had no more than a suspicion of some scheme involving U.S.'s customers, that the action it took was for the purpose of determining whether its suspicions were justified, and that it did not inform U.S. of the situation because it was not yet certain of its ground. The evidence did not demonstrate bad faith as a matter of law.

The estoppel defense involves only one of the six checks. Community, prior to the trial in this case, had recovered a judgment against the maker of the check (who had stopped payment), but the judgment had not been satisfied. A copy of the complaint and the judgment in that case were introduced in evidence. It is U.S.'s position that the judgment for Community against the maker of the check necessarily included a determination that U.S. had not made "final payment" on the check under the terms of ORS 74.2130. U.S. relies on the doctrine of collateral estoppel,[4] and expressly denies any claim of election of remedies. The defense of estoppel by prior litigation against a different party is, however, available only as to matters actually or necessarily litigated in the prior proceeding. *State Farm v. Century Home,* 275 Or 97, 104, 550 P2d 1185 (1976); *Jones v. Flannigan,* 270 Or 121, 124, 526 P2d 543 (1974). In an action on a negotiable instrument, the defendant has the burden of establishing defenses, including payment. ORS 73.3070(2). As the record before us does not include the answer in the prior case, we do not know whether payment was

---

[4]The doctrine of collateral estoppel usually operates to give finality to a prior determination which was *adverse* to the party who is estopped to raise the issue again. As we understand defendant's argument here, it is that plaintiff should not be allowed to take, in this action, a position inconsistent with its *success* in the prior action. See Comment, 59 Harv L Rev 1132 (1945), for a discussion of this distinction.

pleaded. There is certainly nothing before us to indicate that the issue of payment of the check by U.S. was actually or necessarily before the court in that case. The trial court did not err in holding that U.S. had failed to establish its defense of estoppel.

Reversed and remanded for further proceedings in accordance with this opinion.