CUMIS INSURANCE SOCIETY, INC.

v.

WINDSOR BANK & TRUST CO.

Civ. No. H–85–1079 (AHN).

United States District Court, D. Connecticut.

March 27, 1990.

---

Jacob Wieselman, Blume & Elbaum, East Hartford, Conn., for plaintiff.

Lewis Wise, Rogin, Nassau, Caplan, Lassman & Hirtle, Lester Katz and Steven Seligman, Katz & Seligman, Deborah S. Freeman, Skelly, Vinkels, Williams & Rottner, Hartford, Conn., and Martin A. Clayman, Bloomfield, Conn., for defendant.

**1228**

## RULING ON MOTION FOR JUDGMENT ON THE PLEADINGS

NEVAS, District Judge.

On December 18, 1985, the plaintiff in this diversity case, Cumis Insurance Society, Inc. ("Cumis"), a Wisconsin corporation with its principal place of business in that state, brought this action as assignee and subrogee of St. Mary's Windsor Locks Parish Federal Credit Union ("St. Mary's"). In a six-count complaint against Windsor Bank and Trust Co. ("Windsor Bank"), Cumis seeks to recover monies paid to St. Mary's for losses St. Mary's sustained due to the collapse of a check kiting scheme in early August 1985. The first count alleges bad faith. The second count alleges aiding and abetting. The third, fourth and fifth counts allege respectively concealment, negligence and recklessness. Finally, the sixth count alleges a claim for interest income. On February 11, 1986, Windsor Bank filed a motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P. That motion was denied on January 6, 1987 in an order by Senior Judge T. Emmet Clarie (filing no. 23). Windsor Bank subsequently answered the complaint, but now pursues a Rule 12(c), Fed.R.Civ.P., motion for judgment on the pleadings. For the reasons that follow, Windsor Bank's motion is granted.

### I.

■ As a preliminary matter, Cumis has interposed the claim that this court's prior ruling is now the law of the case. Cumis asserts, therefore, that a rehearing of what is in essence the same motion as that previously denied by this court is precluded by the law of the case doctrine. The court disagrees.

Plaintiff's assertion can be disposed of briefly. As Professor Moore explains:

A Court that makes a decision has the power to reconsider it, so long as the case is within its jurisdiction. But after the law of the case is determined by a *superior court*, the inferior court lacks authority to depart from it, and any change must be made by the superior court that established it, or by a court to which it, in turn, owes obedience.

1B J. Moore, J. Lucas, & T. Currier, *Moore's Federal Practice* para. 0.404(1), at 117–18 (2d ed. 1984) (footnotes omitted) (emphasis added). Thus, courts have made clear the proposition that the force with which the doctrine applies depends upon the circumstances of the case. Accordingly, when a judgment of a trial court has been appealed, the appellate court's decision is the law of the case, and the trial court cannot depart from that course on remand. At the trial level, however,

the law of the case is 'little more than a management practice to permit logical progression toward judgment.' Orderly and efficient case administration suggests that questions once decided not be subject to continued argument, but the court has the power to reconsider its decisions until a judgment is entered.

*Jamesbury Corp. v. Litton Indus. Prods., Inc.,* 839 F.2d 1544, 1550 (Fed.Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 80, 102 L.Ed.2d 57 (1988) (footnotes omitted). Regarding the application of this doctrine with respect to a non-appealable denial of summary judgment, the second circuit has stated that "the law of the case [doctrine] is not a limit on the court's jurisdiction, but a rule of practice which may be departed from in the sound discretion of the district court." *Corporacion de Mercadeo Agricola v. Mellon Bank Int'l,* 608 F.2d 43, 48 (2d Cir.1979). When further reflection allows the court to make a better informed ruling in accordance with its conscience, this discretion is not abused. *Id.*

The only limitation placed upon the exercise of such discretion is that prejudice not ensue to the party seeking the benefit of the doctrine. *See First Nat'l Bank v. Am. Foam Rubber Corp.,* 530 F.2d 450, 453 n. 3 (2d Cir.), *cert. denied,* 429 U.S. 858, 97 S.Ct. 157, 50 L.Ed.2d 135 (1976). In this context

prejudice does not mean the harm which results from a failure to apply the doctrine; rather, it refers to a lack of sufficiency of notice and an opportunity to prepare armed with the knowledge that

one judge is disregarding the ruling of another. *United States v. Birney*, 686 F.2d 102, 107 (2d Cir.1982). Plaintiff has not asserted that it has had insufficient notice and opportunity to oppose defendant's motion for judgment on the pleadings. Nor, realistically, could it, considering the memoranda filed by the plaintiff and its extensive oral argument at the hearing on this motion. The court concludes, therefore, that the law of the case doctrine does not prevent this court's reconsideration of its prior ruling.

## II.

### A.

Rule 12(c), Fed.R.Civ.P. provides:

> After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(c). A Rule 12(c) motion may be granted "where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir.1988) (citation omitted). When passing on a motion for judgment on the pleadings, a court must accept as true all well-pleaded facts alleged in the complaint and refrain from dismissing the action unless the non-movant can prove no set of facts that would entitle itself to relief. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir.1985).

### B.

Against this backdrop, Cumis's complaint alleges the following. Under an agreement of insurance, Cumis insured St. Mary's against various losses, including those due to defalcations by third parties. Cumis is the assignee and subrogee of St. Mary's, having acquired by assignment all rights of recovery against the parties responsible for the loss, in consideration for the payments made by it to St. Mary's.

In November 1984, Thomas O'Connor ("O'Connor"), who at one time performed auditing services for Windsor Bank, with the help of William R. Smith ("Smith"), allegedly embarked upon a fraudulent and unlawful scheme commonly known as check kiting. Through this scheme, O'Connor intended to generate and, thereafter, siphon off for his own purposes a substantial float of uncollected bank deposits through the continuous movement of uncollected and non-existent funds between bank and share draft accounts at Windsor Bank and St. Mary's. This was accomplished by the repeated drawing of large checks against one account which then were deposited into the other account, and vice versa (hereinafter referred to as the "Scheme.")

In furtherance of the Scheme, O'Connor and Smith allegedly perpetrated the following acts. O'Connor had a share draft account at St. Mary's which he had opened several years prior to the inception of the Scheme. These drafts were payable through Connecticut National Bank ("CNB"). Likewise, Smith had opened a checking account at Windsor Bank in the name of William R. Smith Realty some time before the Scheme began. Thereafter, O'Connor and Smith drew, or caused to be drawn, certain checks and share drafts against accounts at both institutions. These checks and share drafts were paid, for the most part, by St. Mary's and Windsor Bank against uncollected funds in the respective accounts. Cumis further alleges that in March 1985, Windsor Bank was aware of very large dollar transactions passing between the two accounts. Windsor Bank, through its agent Raymond Halstead ("Halstead"), informed O'Connor of this fact and instructed him to discontinue use of the Smith Realty Account for that purpose and to open, or have Smith open, a business account at Windsor Bank to handle such transactions.

In response, O'Connor and Smith opened three more accounts at Windsor Bank, into which O'Connor made deposits of nearly all of the checks utilized in the Scheme. Furthermore, Windsor Bank, by reason of its scrutiny of the various accounts, knew, should have known, or suspected that O'Connor and Smith were perpetrating the Scheme by using the accounts at Windsor Bank. Windsor Bank also knew, Cumis alleges, that St. Mary's was permitting O'Connor to draw against uncollected funds in O'Connor's account at St. Mary's. Windsor Bank, therefore, implemented a procedure by which it almost immediately presented St. Mary's share drafts to CNB for instant credit to Windsor Bank. Cumis alleges that, as evidenced by its actions, Windsor Bank believed or had reason to believe that in April 1985, a check kiting scheme was also being conducted using the three new accounts. By reason of this procedure, and Windsor Bank's knowledge that it took at least two banking days for St. Mary's to collect funds drawn against the accounts at Windsor Bank, Windsor Bank knew or had reason to know that in the event of the collapse of the Scheme, St. Mary's, in all likelihood, would suffer all of the loss.

Sometime in early August 1985, Windsor Bank began to dishonor checks drawn against Windsor Bank accounts and deposited in St. Mary's, while continuing to collect on the St. Mary's share drafts deposited in Windsor Bank. In June 1985, Smith opened yet another account at Mechanics Savings Bank in Windsor, Connecticut ("Mechanics"). O'Connor and Smith also attempted to utilize said account to perpetrate the Scheme. When an officer of Mechanics called Halstead to inform him that Mechanics was intending to return to Windsor Bank a check for reason of insufficient funds, Halstead related to the Mechanics officer that Smith was involved in a check kiting scheme. The Scheme eventually collapsed in August of 1985.

Cumis also alleges that by reason of its actions, Windsor Bank obtained the benefit of the float between Windsor Bank and St. Mary's that was created by the Scheme, by investing said float and thereby earning interest and profits on funds which it knew, had reason to know or should have known did not exist.

## III.

A federal court sitting in diversity must be mindful that it follow the law determined by the highest court of the state whose law is applicable to resolution of the dispute. *Plummer v. Lederle Laboratories*, 819 F.2d 349, 355 (2d Cir.), *cert. denied*, 484 U.S. 898, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987). When that state court has not directly ruled on the issue under consideration, the federal court "'must make an estimate of what the state's highest court would rule to be its law.'" *Carpentino v. Transp. Ins. Co.*, 609 F.Supp. 556, 560 (D.Conn.1985) (Zampano, J.) (quoting *Cunninghame v. Equitable Life Assurance Soc'y of United States*, 652 F.2d 306, 308 (2d Cir.1981)). *See also Plummer*, 819 F.2d at 355. In calculating this estimate, the federal court may consider all data the high court would use in reaching its decision. *Doyle v. St. Paul Fire & Marine Ins. Co.*, 583 F.Supp. 554, 555 (D.Conn.1984) (Dorsey, J.). Thus, the federal court may discern the forum state's law by examining relevant decisions from the forum state's inferior courts, decisions from sister states, federal decisions, and the general weight and trend of authority.[1]

Windsor Bank's motion raises an issue of first impression in Connecticut: whether one bank, which knows of the existence of

1. Neither party has addressed the question of the applicable state law. Instead, both Cumis and Windsor Bank ostensibly assume that Connecticut law applies. Invoking Connecticut conflict of laws principles, as required by *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941), the court concludes that a Connecticut court would apply its substantive law to the issues raised by this motion. In the record before the court, the only factual ties to a state other than Connecticut is the Wisconsin corporate citizenship of Cumis and Cumis's use of Madison, Wisconsin as its principal place of business. Under a tort choice of law analysis, *see O'Connor v. O'Connor*, 201 Conn. 632, 519 A.2d 13 (1986), Connecticut law governs resolution of the instant dispute.

a check kiting scheme, has a duty to disclose this fact to other banks affected by that scheme.

### IV. The Complaint

#### A. The First Count: Bad Faith

█ The first count of Cumis's complaint alleges that Windsor Bank, contrary to reasonable, customary, and accepted banking practices, did not, prior to the Scheme's collapse, inform St. Mary's of its suspicions and knowledge regarding the Scheme. In failing to do so, Windsor Bank is alleged to have acted in bad faith in its dealings with St. Mary's, in violation of Conn.Gen.Stat. Sections 42a-4-103 and 42a-1-203. Cumis's reliance on the Uniform Commercial Code's ("UCC") bad faith doctrine, however, is misplaced.

The UCC mandates that "[e]very *contract* or *duty* within this title imposes an obligation of good faith in its performance or enforcement." Conn.Gen.Stat. Section 42a-1-203 (1989) (emphasis added). Conn. Gen.Stat. Section 42a-4-103 (1989) also mandates that banks conduct business in good faith. Thus, if Cumis were to bring suit under the UCC on the checks utilized in the Scheme, a finding of bad faith on the part of Windsor Bank would be salient to any resolution of that suit.

The UCC provides that:

> Except for recovery of bank payments as provided in Article 4 and except for liability for breach of warranty on presentment under the preceding section, payment or acceptance of any instrument is final in favor of a holder in due course, or a person who has in good faith changed his position in reliance on the payment.

Conn.Gen.Stat. Section 42a-3-418 (1989). Thus, unless breach of warranty were involved,[2] if Windsor Bank were deemed a holder in due course, payment to them would be final, and Cumis would be unable to recover under the UCC. The rationale underlying this rule is that the drawee, here St. Mary's, "is responsible for know-ing the state of the account before he accepts or pays." Conn.Gen.Stat. Section 42a-3-418 comment 2 (1989). There are, however, exceptions to this rule. If it were shown that Windsor Bank acted in bad faith, this would operate to deprive Windsor Bank of its status as a holder in due course. Conn.Gen.Stat. Section 42a-3-302(1) (1989). Thus, payment would not be final under Conn.Gen.Stat. Section 42a-3-418. Likewise, the UCC allows a payor bank to recover a payment improperly paid if it returns the item or sends notice of dishonor. Conn.Gen.Stat. Section 42a-4-301 (1989).

Both Conn.Gen.Stat. Sections 42a-3-418 and 42a-3-301 are, however, subject to the limitations of Conn.Gen.Stat. Section 42a-4-213, which also delineates when a payor bank has finally paid an item. That section provides, in relevant part, that:

> (1) An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first: (a) Paid the item in cash; or (b) settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearing house rule or agreement; or (c) completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith; or (d) made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing house rule or agreement. Upon a final payment under subparagraphs *(b)*, *(c)* or *(d)* the *payor bank* shall be accountable for the amount of the item.

Conn.Gen.Stat. Section 42a-4-213 (1989). Thus, Section 42a-4-213, in conjunction with Conn.Gen.Stat. Sections 42a-4-301 and 302, operate to determine when final payment is made. Accordingly, even if it were shown that Windsor Bank was not a holder in due course due to its lack of good faith, these sections would operate to deny Cumis recovery under the UCC if St.

---

**2.** In its complaint, plaintiff has not alleged any breach of warranty pursuant to Conn.Gen.Stat. 42a-4-207 (1989). Nevertheless, on the record before the court, the warranties of that section would be inapplicable to this action.

Mary's had made final payment on the note, that is, for example, if St. Mary's had failed to dishonor the share drafts before the midnight deadline. *See Town & Country State Bank v. First State Bank,* 358 N.W.2d 387, 393–95 (Minn.1984).

However, Cumis, perhaps because St. Mary's had made final payment, has elected not to bring suit under the UCC, but rather has attempted to construct an amorphous common law bad faith claim. Cumis nowhere alleges that there was at any time a contract between St. Mary's and Windsor Bank. Cumis does allege, however, that Windsor Bank, contrary to reasonable, customary, and accepted banking practices and procedures, acted in bad faith in its dealings with St. Mary's by failing to disclose to St. Mary's its suspicions and knowledge regarding the Scheme. Nonetheless, Cumis fails to point to any case, statute or UCC provision which embody the "banking practices" Windsor Bank is alleged to have disregarded. Moreover, Cumis cites no authority which would impose upon Windsor Bank a duty of disclosure in this context, a duty indispensable to Cumis's claim. While Connecticut courts have not dealt with the issue presented here, several courts of other jurisdictions have adjudicated similar claims.

Perhaps the leading case with regard to the duty, if any, one bank owes another is *Citizens Nat'l Bank v. First Nat'l Bank,* 347 So.2d 964 (Miss.1977). In *Citizens,* First National Bank ("FNB") discovered a check kiting scheme that was being perpetrated upon itself and Citizens National Bank ("CNB"). At that time, FNB, like Windsor Bank, began both to refuse payment on checks drawn against its accounts while continuing to accept deposits to its accounts of checks drawn on, and paid from, accounts at CNB. *Id.* at 966. When the check kiting scheme eventually collapsed, CNB filed a complaint to recover funds which it claimed were "wrongfully and unlawfully converted and appropriated monies belonging to Citizens National Bank." *Id.*

In addressing CNB's appeal from the chancery court's demurrer of its complaint, the Mississippi Supreme Court framed the issue as "whether First National Bank had a legal duty to notify Citizens National Bank that it was convinced that [the customer] was kiting checks." *Id.* at 967. The supreme court affirmed the chancery court's ruling, reasoning that:

> [T]hese two banks were competitors in the banking field and ordinarily banks deal with each other at arm's length. The bill does not allege any circumstances or facts that tend to show that a confidential or fiduciary relationship existed between these two banks, neither does it show that there is any requirement in the banking field that one bank notify another of its discovery of a customer kiting checks. In the absence of a fiduciary or confidential relationship, or some other legal duty, *First National Bank had no duty to inform Citizens National Bank that [the customer] was kiting checks.*

*Id.* (emphasis added). The court further noted that CNB "could have refused to credit [the customer's] account until the checks cleared," *id.* and that FNB "had a legal right to do the things it did for its own protection." *Id.* at 969.

Since the holding in *Citizens,* several courts have addressed the existence *vel non* of the duty discussed herein. *Mid–Cal Nat'l Bank v. Fed. Reserve Bank,* 590 F.2d 761 (9th Cir.1979) addressed the duty of a bank to *discover* a check kiting scheme. In that case, the ninth circuit affirmed the district court's grant of summary judgment, finding that the bank did not have such duty. The court explained that:

> The relationship between these banks contains none of the qualities that lead courts and commentators to find parties legally blameworthy for failing to help another. No fiduciary or confidential nature to their relationship was alleged; they related at arms length. [The plaintiff] was in no need of protection from Mid–Cal; it had computers and other means available to it to detect the kite, and was able to protect itself from loss. To determine that in such a situation Mid–Cal owed a duty to discover the kite

would be to alter radically the nature of banking and the general conduct of business. Such an alteration is neither necessary nor warranted. *Id.* at 763. The court, citing *Citizens*, reasoned, therefore, that if a bank had no duty of disclosure when it knew of kiting activity, a bank certainly should not be liable for "failing to discover information that, in any event, it was not required to convey." *Id.* at 764.

■ Other courts have reached conclusions similar to those of the *Citizens* and *Mid–Cal* courts. *See, e.g., FDIC v. Imperial Bank*, 859 F.2d 101, 104 (9th Cir.1988) ("As a general rule, unless a special relationship gives rise to a duty to act, a defendant is under no duty to take affirmative action to assist or protect another...."); *Chicago Title Ins. Co. v. Superior Court*, 174 Cal.App.3d 1142, 1159, 220 Cal.Rptr. 507, 519 (1985) (bank owed neither a common law nor statutory duty to disclose existence of a check kiting scheme); *Pennsylvania Nat'l Turf Club, Inc. v. Bank of West Jersey*, 158 N.J.Super. 196, 203, 385 A.2d 932, 936 (1978) (in the absence of any agreement, undertaking or contract between the banks from which a special duty can be derived, bank had no duty to inform or warn plaintiff). There is thus no duty between competing institutions to inform one another of the existence of a check kiting scheme because these institutions deal at arms length, have their own means of detecting check kiting, and, realistically, need no protection from other institutions. *See Norwest Bank Black Hills, N.A. v. Rapid City Teachers Fed. Credit Union*, 433 N.W.2d 560, 565 (S.D.1988) (Erickson, J., concurring in part and dissenting in part). There are, however, recognized exceptions to the general rule; banks have a duty of disclosure: 1) where some special relationship has been established, either by a fiduciary or confidential relationship; 2) where there was a contractual relationship; 3) where there is a duty created by law; and 4) where there was a fraud or misrepresentation on the part of the defendant bank. *Id.* (citing *Citizens*, 347 So.2d 964; *Mid–Cal*, 590 F.2d 761). In its complaint, Cumis has not alleged any special or con-

tractual relationship between St. Mary's and Windsor Bank. Cumis also fails to support its assertions by reference to any legal duty owing to St. Mary's. Finally, neither Windsor Bank nor its agents are alleged to have committed any unlawful or wrongful acts. Since Cumis has failed to allege any facts that would create an exception to the general rule, Windsor Bank's motion for judgment on the pleadings must be granted with respect to the first count.

In its opposition to Windsor Bank's motion, and in oral argument at the hearing on said motion, Cumis cited several cases for the proposition that a bank has a duty to disclose its suspicion or knowledge of a check kiting scheme's existence. These cases, however, are inapposite. For example, in *Community Bank v. United States Nat'l Bank*, 276 Or. 471, 555 P.2d 435 (1976), a wrongful failure to pay suit, United States National Bank ("US") received and honored stop payment orders on checks that were presented to US by Community Bank ("Community"). The court framed the issue as whether, under Oregon's version of the UCC, US was entitled to honor the stop payment order, or whether it had already become liable to Community. *Id.* at 473, 555 P.2d at 436. US presented evidence that Community had suspected one of its customers of a check kiting scheme which might also have involved US customers. Community had decided, therefore, not to honor checks drawn on that customer's account until checks deposited in that account had been paid. *Id.* at 479–80, 555 P.2d at 440. Therefore, US asserted, as an *affirmative defense*, that Community should have informed US of its suspicions. Because Community had failed to do so, US contended, it acted in bad faith in presenting the checks to US. *Id.*, 555 P.2d at 440. The supreme court, however, upheld the trial court's finding that evidence of a mere suspicion of some scheme did not demonstrate bad faith as a matter of law. *Id.* at 480, 555 P.2d at 440.

Plaintiff here asserts that the inference can be drawn from *Community Bank* that if a bank had actual knowledge, rather than a mere suspicion, of a check kiting

scheme, that a finding of bad faith is warranted. While this may be true, such an inference is still of no avail. In *Community Bank*, the action was brought under the UCC for wrongful failure to pay. Furthermore, US asserted its bad faith claim as an affirmative defense. The absence of such claims in the instant case distinguishes *Community Bank*.[3]

Plaintiff also cites *Town & Country State Bank v. First State Bank*, 358 N.W.2d 387 (Minn.1984). However, both the trial court and the parties in that case had agreed that the defendant bank had a duty to act in good faith, that is, to inform the plaintiff of a check kiting scheme. *Id.* at 391. Much of the court's opinion, therefore, deals with the definition of good faith in this context. Since the principal issue in the instant case is the very existence of such a duty, *Town & Country* is likewise inapposite.

### B. The Second Count: Aiding and Abetting

■ In the second count of its complaint, Cumis alleges that by its actions, Windsor Bank aided and abetted the Scheme perpetrated by O'Connor and Smith. Once again, Cumis fails to cite a Connecticut case supporting this cause of action. Moreover, it has vehemently, and correctly, asserted that this count does not sound in tort for civil conspiracy.[4] Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss, March 24, 1986, at 21–22.

Rather, Cumis's aiding and abetting claim is more analogous to similar claims asserted in securities litigation. Although courts have found some of these claims to be supported by securities legislation, *see, e.g., Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698

(1978) (aider and abettor liability appropriate under section 10(b)), courts have also recognized the common law origins of aider and abettor liability. *See, e.g., Atlanta Shipping Corp. v. Chemical Bank*, 818 F.2d 240, 250–51 (2d Cir.1987) (citing *Ballantine v. Ferretti*, 28 N.Y.S.2d 668, 690–91 (Sup.Ct.1941)).

In order to establish aider-abettor liability, plaintiffs must fulfill the requirements of a three prong test. The plaintiff must prove: 1) a fraud by the primary violator or principal 2) knowledge of that fraud by the alleged aider-abettor and 3) substantial assistance to the principal in committing that fraud. *See Rolf*, 570 F.2d at 47–48; *Edwards & Hanly v. Wells Fargo Secs. Clearance Corp.*, 602 F.2d 478, 483 n. 5 (2d Cir.1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980). Cumis has sufficiently alleged that O'Connor and Smith perpetrated a fraud, and that Windsor Bank had knowledge thereof. It remains, however, whether Windsor Bank substantially assisted them in the fraud's commission, a question properly decided by the court. *Edwards & Hanly*, 602 F.2d at 484.

In *Edwards & Hanly*, the court directly addressed the question whether a defendant's silence in the face of alleged knowledge that the principal was committing a fraud was sufficient to meet the third prong of the test. The court stated that the answer depended, *inter alia*, on whether the defendant had a duty to speak. *Id.* Thus, in the absence of some special relationship that is fiduciary in nature, the court stated that to find a party liable for aiding and abetting required "something closer to an actual intent to aid in a fraud." *Id.* at 485. *See also Atlanta Shipping*, 818 F.2d at 251 (aider-abettor liability hing-

---

**3.** To the same effect is *Farmers & Merchants State Bank v. Western Bank,* 841 F.2d 1433 (9th Cir.1987), which is also cited by the plaintiff. In *Western Bank,* Farmers & Mechanics State Bank ("Farmers") brought suit on the instrument under the UCC against Western Bank ("Western") when Western refused to honor its cashier's check. *Id.* at 1434. As it pertains to the case at bar, the question presented in *Western Bank* was whether Farmers's knowledge of a check kiting scheme constituted bad faith,

which would deprive it of holder in due course status. This, in turn, would make Farmers susceptible to Western's affirmative defenses on the instrument. *Id.* at 1442–51. For the reasons stated above, the reasoning of *Western Bank* is also inapplicable to the case at bar.

**4.** If it did, *Williams v. Maislen,* 116 Conn. 433, 165 A. 455 (1933), Connecticut's seminal case on civil conspiracy, would control.

es upon showing that defendant knowingly completed acts with the *purpose* of aiding and abetting the principal); *Woodward v. Metro Bank*, 522 F.2d 84, 97 (5th Cir.1975) ("When it is impossible to find any duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high 'conscious intent' variety can be proved.").

It has already been established that Windsor Bank owed no duty of disclosure to St. Mary's. It is, therefore, incumbent upon Cumis to allege that Windsor Bank intended to aid or abet O'Connor and Smith in their perpetration of the Scheme. Yet Cumis's complaint lacks this necessary element. Similarly, Cumis has alleged no wrongful or unlawful acts on the part of Windsor Bank or any of its agents. While Windsor Bank's actions can be described as less than altruistic, it is evident that its only intent was to protect itself from any losses that might stem from the Scheme. *Cf. Citizens*, 347 So.2d at 969 (bank had a legal right to do what it did "for its own protection"). The mere fact that O'Connor and Smith could not have perpetrated the Scheme "but for" the acts, or omissions, of Windsor Bank is also an insufficient ground upon which to predicate aider-abettor liability. *See Edwards & Hanly*, 602 F.2d at 484. Moreover, it is still not altogether clear that what Windsor Bank did was aid or abet, rather than collapse, the Scheme. Therefore, for the reasons stated above, judgment for the defendant shall enter on the aiding and abetting count.

C. Counts Four Through Six: The "Concealment," Negligence, Recklessness and Interest Claims

The third count of Cumis's complaint alleges that Windsor Bank concealed information that it was obligated to divulge to St. Mary's. In essence, this claim is merely a circuitous restatement of the proposition that Windsor Bank had a duty to disclose the Scheme to St. Mary's.[5] Likewise, counts four and five allege respectively that Windsor Bank was negligent and reckless in failing to conduct its dealings with St. Mary's in accordance with reasonable, customary, and accepted banking practices. As with the first count, a necessary element of these three counts is a duty running from Windsor Bank to St. Mary's.

An action based on tort theory is separate and distinct from any claim based on the instrument under the UCC. *Sheiman v. Lafayette Bank & Trust Co.*, 4 Conn.App. 39, 44, 492 A.2d 219, 222 (1985). In order to prevail on these claims, Cumis must establish that Windsor Bank breached a legal duty owed to St. Mary's. *Id.*, 492 A.2d at 222. But to sustain a cause of action in tort, the court must first determine whether the defendant in fact owed a duty to the plaintiff. *Shore v. Town of Stonington*, 187 Conn. 147, 151, 444 A.2d

5. The defendant cites *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. First Nat'l Bank*, 774 F.2d 909 (8th Cir.1985), a check kiting case, in support of its concealment claim. In that case, Merrill Lynch was essentially acting as a bank. The perpetrators of the scheme were drawing checks on an account at a third institution and depositing them in Merrill Lynch's account at First National. First National thereafter became aware that the drawee bank was dishonoring these checks and returning them to First National. As a result, First National would charge back these items to Merrill Lynch's account. However, First National did not promptly inform Merrill Lynch that this charge back was occurring. If it had been informed, Merrill Lynch asserted, it would have known of the scheme and could have protected itself by not paying First National for other checks drawn by the perpetrators of the scheme. *Id.* at 911. In affirming the district court's judgment for Merrill Lynch, the court of appeals relied on two factors not present in the case at bar: Merrill

Lynch's status as a customer of First National and First National's superior knowledge in that situation. The court reasoned that:

> While [*Mid–Cal* and *Citizens*] may correctly state the law as to dealings between banks when both have equal opportunity to discover a check-kiting scheme, they do not stand for the proposition that a bank may act unilaterally to shift the resulting loss onto a depositor who is relying on the bank's policy of giving prompt notice of checks to be charged back to its account. The District Court correctly ruled that FNB, if it had committed itself to a course of dealing with its customer, was not entitled to depart from that course of dealing in order to take advantage of superior knowledge.

*Id.* at 914. Cumis has nowhere alleged either that St. Mary's was a customer of Windsor Bank or that Windsor Bank had superior knowledge of the Scheme. For these reasons, application of *Merrill Lynch* to the case at bar is inappropriate.

**1236**

1379, 1381 (1982). The existence of this duty, therefore, is a question of law. *Sheiman*, 4 Conn.App. at 45, 492 A.2d at 222. This requisite duty of care may arise from contract, statute, or circumstances under which a reasonable person would anticipate that harm of the general nature of that suffered was likely to result. *Coburn v. Lenox Homes, Inc.*, 186 Conn. 370, 375, 441 A.2d 620, 624 (1982). "Negligence cannot be predicated upon the failure to perform an act which the actor was under no duty or obligation to perform." *Sheiman*, 4 Conn.App. at 45, 492 A.2d at 222. Thus, in actions based on omissions to act, or nonfeasance, it is necessary that there exist some definite relation between the parties, such that social policy justifies the imposition of a duty to act. W. Prosser & W. Keeton *The Law of Torts* 374 (5th ed. 1984). Like actions in negligence, a claim based on reckless conduct must also allege some duty running from the plaintiff to the defendant. *Sheiman*, 4 Conn.App. at 46, 492 A.2d at 223. Here, because Cumis has failed to allege any such relation, contract, statute or circumstances which would give rise to a duty owed by Windsor Bank to St. Mary's, judgment on the third, fourth, and fifth counts must be entered for the defendant.

Finally, in the sixth count of its complaint, Cumis alleges that it is entitled, by reason of the damages it sustained as a result of Windsor Bank's actions and as a matter of equity, to interest income earned by Windsor on the float caused by the Scheme. Since Windsor Bank had no duty to disclose the existence of the Scheme to St. Mary's, it cannot be said that Windsor Bank legally caused any of St. Mary's losses. Furthermore, as a matter of equity, Cumis has failed to allege that Windsor Bank was in a better position to detect the Scheme than St. Mary's. A drawee bank, here St. Mary's, is responsible for knowing the state of an account before it honors a draft drawn on that account. *See* Conn. Gen.Stat. Section 42a–3–418 comment 2. St. Mary's knew that O'Connor was drawing against insufficient funds, yet continued to honor drafts drawn against his account. If equity were to operate at all in

this context, it would be to estop Cumis from asserting this action. Judgment on the sixth count must therefore be entered for the defendant.

### Conclusion

For the foregoing reasons, the court grants Windsor Bank's Rule 12(c), Fed.R. Civ.P., motion.

SO ORDERED.