[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MOTION TO DETERMINE INTERESTS IN DISPUTED PROPERTY
 I
On October 30, 2001, the plaintiff, Jane Kowalski as conservator of the estate of Mary Romanowski (ward), filed an ex parte application for a prejudgment remedy (PJR) against the defendants, Stanislaw Budz, Aniela Budz, Chuck Budz and American Savings Bank (American Savings). The PJR documents alleged the following facts: that Stanislaw Budz and Aniela Budz are husband and wife and that Chuck Budz is their son; that the plaintiff was appointed conservator of her ward's estate on October 23, 2001; that in the course of managing her ward's affairs the plaintiff discovered that the Budzes had, within the recently preceding months, unlawfully transferred and conveyed to themselves title to many of the ward's assets, including her residence and monies from her bank account, and had deposited checks payable to her in an account held by Chuck Budz at American Savings; that Stanislaw Budz was able to accomplish such transfers using an unauthorized and improperly executed power-of-attorney purportedly granted to him by the ward; and that on October 29, 2001, a fraud officer at American Savings informed the plaintiff that Chuck Budz had purchased on October 23, 2001, and October 26, 2001, two cashier's checks totaling $103,000 payable to himself from the money deposited in his account. Wherefore, the plaintiff requested a PIP. order to attach the interests of Chuck Budz in his account at American Savings and in the two cashier's checks and to garnishee American Savings to the extent of any debt or other obligation it may owe to Chuck Budz. The court, Beach, J, granted the PJR on October 30, 2001.
On November 13, 2001, American Savings filed the present motion before the court requesting a determination of interests in disputed property pursuant to General Statutes § 52-356c.[1] American Savings represents in its motion that upon information and belief Chuck Budz negotiated the two cashier's checks to the Mohegan Tribal Gaming Authority (Mohegan) and that Mohegan, who presented the checks to American Savings for payment on October 30, 2001, and October 31, 2001, is claiming an interest in the checks superior to any interest of Chuck Budz. Accordingly, the motion was prompted by American Savings' uncertainty as to whether the prejudgment remedy obtained by the plaintiff on October 30, 2001, attached to the cashier's checks so as to prevent it from making payment on them to Mohegan.
On November 19, 2001, Mohegan was served with a copy of American Savings' motion and filed an appearance as an interested party on January 16, 2002, and a memorandum on January 25, 2002. Hearings on the motion CT Page 8203-i were held between January 25, 2002, and January 30, 2002. A stipulation of facts was signed by all parties to this motion[2] and was filed on January 25, 2002. Post-hearing memoranda were filed by all parties).[3]
 II STIPULATION OF FACTS
The parties stipulate to the following facts:
1. On July 20, 2001, Chuck Budz opened account number 30-008491 at American Savings Bank (the "account") by depositing a check for $15,000 (no. 60119772) from American Eagle Federal Credit Union, payable to Stanislaw Budz, endorsed by "S Budz" and Chuck Budz.
2. On September 8, 2001, Chuck Budz deposited three checks totaling $218: for $82.80 (no. 007319) from USX, dated June 9, 2001, payable to Mary Romanowski and endorsed by Mary Romanowski and Chuck Budz; for $56 (no. 188402) from IBM, dated June 9, 2001, payable to Mary Romanowski and endorsed by Mary Romanowski and Chuck Budz; and for $79.20 (no. 5160) from United Technologies, dated June 10, 2001, payable to Mary Romanowski and endorsed by Mary Romanowski and Chuck Budz, into the account.
3. On September 13, 2001, Chuck Budz deposited a check for $35,665.89 (no. 1837980) from Advest, Inc., payable to "Mary Romanowski, Stanislv Romanowski, P.O.A.," endorsed by "Stanislaw Budz P.O.A. Mary Romanowski" and Chuck Budz, into the account.
4. On September 20, 2001, Chuck Budz withdrew $455 in a money order (no. 039861) payable to "U.S. INS," from the account.
5. On September 29, 2001, Chuck Budz withdrew $4,800 cash from the account, a transaction that was posted to his account on October 1, 2001.
6. On October 1, 2001, Chuck Budz made a cash ATM withdrawal of $200 from the account.
7. On October 3, 2001, Chuck Budz deposited a check for $21,231.44 (no. 1845504) from Advest, Inc., payable to "Mary Romanowski, Stanislv Budz, P.O.A.," endorsed by "Stanislaw Budz P.O.A. Mary Romanowski" and Chuck Budz, into the account.
8. On October 4, 2001, Chuck Budz made a cash ATM withdrawal of $300 and a $4,900 cash withdrawal from the account. CT Page 8203-j
9. On October 6, 2001, Chuck Budz withdrew $3,800 cash from the account, a transaction that was posted to his account on October 9, 2001.
10. On October 9, 2001, Chuck Budz made cash ATM withdrawals totaling $600 consisting of two withdrawals of $300 each, from the account.
11. On October 10, 2001, Chuck Budz made a cash ATM withdrawal of $200 and a $5100 cash withdrawal from the account.
12. On October 11, 2001, Chuck Budz made a cash ATM withdrawal of $300 from the account.
13. On October 12, 2001, Chuck Budz deposited a check for $750 (no. 70174861) from Liberty Mutual, dated October 9, 2001, payable to Edward Kielasinski, endorsed by Ed Kielasinski and Chuck Budz, into the account, and made a $300 ATM withdrawal and a $2,500 cash withdrawal from the account.
14. On October 13, 2001, Chuck Budz withdrew $4,500 cash from the account, a transaction that was posted on October 15, 2001.
15. On October 15, 2001, Chuck Budz deposited a check for $564.26 (no. 1861484) from Advest, Inc., dated October 12, 2001, payable to "Mary Romanowski, Stanislv Budz, P.O.A.," endorsed by "Mary Romanowski Stanislaw Budz P.O.A." and Chuck Budz, into the account, and made ATM withdrawals totaling $600, consisting of two ATM withdrawals of $300 each, and withdrew $3,350 cash, from the account.
16. On October 18, 2001, Chuck Budz made a cash ATM withdrawal of $300 and a $2,600 cash withdrawal from the account.
17. On October 19, 2001, Chuck Budz deposited a check for $161,392.05 (no. 5903198) from State Treasurer, dated October 16, 2001, payable to Mary Romanowski, endorsed by Mary Romanowski and Chuck Budz, into the account.
18. On October 22, 2001, Chuck Budz deposited a check for $30,280.38 (no. 1863387) from Advest, Inc., dated October 19, 2001, payable to "Mary Romanowski, Stanislv Budz, P.O.A.," and endorsed by "Stanislaw Budz P.O.A. Mary Romanowski" and Chuck Budz into the account, and made cash ATM withdrawals totaling $600, consisting of two ATM withdrawals of $300 each, and withdrew $2,700 cash, from the account.
19. At the close of business on October 22, 2001, the account balance in the account was $195,697.90. CT Page 8203-k
20. On October 23, 2001, Chuck Budz withdrew $65,000 in a cashier's check (no. 049418), payable to Chuck Budz, and $27,064.14 in a cashier's check (no. 049418), payable to Schaller Mitsubishi, and cash withdrawals totaling $14,500, consisting of one withdrawal of $6,000 cash and another of $8,500 cash, from the account.
21. On October 24, 2001, Chuck Budz made cash withdrawals totaling $7,000, consisting of a $4,450 cash withdrawal and a $2,550 cash withdrawal, and withdrew $3,000 in a cashier's check (no. 072043) payable to Edward Kielasinski, and $4,450 in a cashier's check (no. 072041) payable to Agnes Budz, from the account.
22. On October 25, 2001, Chuck Budz made a cash ATM withdrawal of $300 from the account.
23. Also on October 25, 2001,[4] Jane Kowalski was appointed conservator of the estate of Mary Romanowski.
24. On October 26, 2001, Chuck Budz withdrew $38,000 in a cashier's check (no. 072087) payable to Chuck Budz, and $5,500 cash, from the account.
25. The transactions described in paragraphs 1 through 23 include deposits of checks payable to Mary Romanowski totaling $249,342.02, and withdrawals totaling $202,619.14, not including fees.
26. On October 25, 2001, Chuck Budz negotiated the $65,000 cashier's check to Mohegan in exchange for deposit credit.
27. On October 27, 2001, Chuck Budz negotiated the $38,000 cashier's check to Mohegan in exchange for deposit credit.
28. On October 25 and 27, respectively, Mohegan deposited the checks into its account at Fleet Bank.
29. At the close of business on October 29, 2001, the account had a balance of $30,881.01. Also, as of October 29, 2001, Mohegan had no further funds on deposit from Chuck Budz.
30. On October 30, 2001, Judge Beach issued an Order for Prejudgment Remedy Ex Parte, in which he ordered "that the plaintiff may attach to the value of $222,392.05 the account of the defendant, Chuck Budz, at American Savings Bank, and his interest in two bank checks drawn by him on said account, each of which checks is payable to him, as follows: a check in the amount of $65,000.00 issued by American Savings Bank on CT Page 8203-l October 23, 2001 and a check in the amount of $38,000.00 issued by American Savings Bank on October 26, 2001 and it is further ORDERED that the plaintiff may garnishee American Savings Bank to the extent of any debt or obligation it has to the said defendant by reason of the said two checks."
31. Also on October 30, 2001, counsel for Jane Kowalski notified American Savings Bank of the Order for Prejudgment Remedy Ex Parte, by telephone and by delivering a copy of said order by facsimile transmission to American Savings Bank.
32. Also on October 30, 2001, Fleet Bank presented check no. 049418 for $65,000 to American for payment.
33. Also on October 30, 2001, a representative for American telephoned a representative for Fleet Bank to inform Fleet Bank that it would stop payment on check no. 049418 for $65,000 and physically returned the check to Fleet Bank for reason of payment stopped.
34. On October 31, 2001, Fleet Bank was served with the Order for Prejudgment Remedy Ex Parte.
35. Also on October 31, 2001, Fleet Bank presented check no. 072087 for $38,000 to American for payment.
36. Also on October 31, 2001, a representative for American telephoned a representative from Fleet Bank to inform Fleet Bank that it would stop payment on check no. 072087 for $38,000 and physically returned the check to Fleet Bank for reason of payment stopped.
37. On November 2, 2001, Mohegan received the return of the dishonored $65,000 cashier's check stamped "stop payment."
38. On November 5, 2001, Mohegan received the return of the dishonored $38,000 cashier's check stamped "stop payment."
 III
American Savings' motion on its face requests a determination of (1) the interests of the various parties in the disputed property, (2) whether, by making payment on the cashier's checks to Mohegan, American Savings would violate the October 30, 2001 PJR order and (3) whether by failing to make payment on the cashier's checks American Savings would incur liability to Mohegan. The first two issues are interrelated and may be restated as whether, at the time the prejudgment remedy order issued, Chuck Budz had any interest in the checks to which the order could CT Page 8203-m attach. The third issue is addressed in turn.
 A Whether Cashier's Checks Within Scope of PJR Order 1 Parties' Positions
Relative to the first two issues, the plaintiffs position is that the PJR order validly attached to the cashier's checks and thus prevents American Savings from making payment to Mohegan. The plaintiff argues that the cashier's checks were made payable to Chuck Budz and thus evidence on their face an obligation owed to him by American Savings. The plaintiff further argues that Chuck Budz's interest in the checks continued until American Savings made payment on them. This interest, the plaintiff contends, is evidenced by the fact that Chuck Budz could have required American Savings to stop payment on them up until such time as they were actually paid by American Savings. Since the PJR order became effective prior to payment, the plaintiff argues that the order timely and effectively attached to Chuck Budz's interest in the checks.
American Savings supports the plaintiffs position that the cashier's checks are within the scope of the PJR order. It too argues that Chuck Budz's right to stop payment on the checks constitutes a property interest in them which became subject to the PJR order.
Mohegan, to the contrary, asserts that it is entitled to immediate payment on the cashier's checks plus interest and costs resulting from American Savings' wrongful dishonor of them. Mohegan argues that once the cashier's checks were issued payable to Chuck Budz and the funds used to purchase them were debited from his account, it became American Savings' direct obligation to honor the checks. Since Chuck Budz negotiated them to Mohegan, Mohegan concludes, American Savings' obligation was to pay Mohegan upon presentment, and Chuck Budz had no further interest in the checks to which the PJR order could attach. Mohegan further asserts a procedural argument that American Savings' motion is improper because § 52-356c is a postjudgment statute inapplicable in the present circumstances.
Finally, while none of the Budzes assert any entitlement to or interest in the cashier's checks, they urge the court to find that the PJR order attached to the checks. They further argue, similar to Mohegan's claim, that American Savings' reliance on § 52-356c as the proper procedural vehicle with which to raise the present issues is misplaced as that CT Page 8203-n statute is only applicable postjudgment.
 2 Procedural Propriety of § 52-356c
The court first addresses the procedural issue raised by Mohegan and the Budzes that § 52-356c is only applicable postjudgment and, because the present dispute is prejudgment, American Savings' utilization of § 52-356c to bring the present motion is improper. American Savings defends its use of § 52-356c as appropriate and further argues that even if § 52-356c is inapplicable the court may treat its motion as a motion to clarify, interpret or correct the PJR order. The court agrees with American Savings on both of these points and further rejects the procedural impropriety arguments of Mohegan and the Budzes as untimely.
Under the Post-judgment Remedies Act, General Statutes § 52-350a et seq., "disputes about the validity of a garnishment may be adjudicated in a hearing in supplemental proceedings that are ancillary to the underlying action. See General Statutes § 52-356c." Hospital of St.Raphael v. New Haven Savings Bank, 205 Conn. 604, 607 n. 3, 534 A.2d 1189
(1987). Clearly, the present motion is ancillary to the plaintiffs underlying action to determine the scope of a prejudgment remedy and its attachment. The garnishment order was served upon American Savings on October 30, 2001, and American Savings brought its motion on November 13, 2001, within twenty days of the service of the order as prescribed by § 52-356c (a).
Even if § 52-356c is inapplicable in present circumstances, however, the court may treat American Savings' motion as a motion to clarify and/or interpret an order of the court. "[M]otions for interpretation or clarification, although not specifically described in the rules of practice, are commonly considered by trial courts and are procedurally proper." (Internal quotation marks omitted.) AvalonBayCommunities, Inc. v. Plan Zoning Commission, 260 Conn. 232, 244, ___ A.2d ___ (2002); see also Holcombe v. Holcombe, 22 Conn. App. 363, 366,576 A.2d 1317 (1990).
Finally, to raise an issue of procedural impropriety post-hearing is untimely and can only be considered a delay tactic. Each party received a copy of American Savings' motion, each party signed the stipulation of facts and this court held hearings which spanned multiple days to determine the interests in the disputed property. At no time prior to the hearings nor during the hearings did any party raise the issue of procedural impropriety. Instead, the issue was raised for the first time CT Page 8203-o in Mohegan's and the Budzes' post-hearing memoranda. Thus, any procedural issues must be deemed waived.
 3 Scope of PJR Order
The court now turns to the substance of American Savings' motion, namely, whether, at the time the prejudgment remedy order issued, Chuck Budz had any interest in the checks to which the order could attach. For the reasons that follow, this court finds that Chuck Budz, having negotiated the checks to Mohegan prior to the issuance of the prejudgment remedy order, no longer possessed any interest in the checks to which the prejudgment remedy order could attach. Thus, the court holds that the prejudgment remedy order, by itself, poses no impediment to the bank's honoring of the checks.
"A writ of garnishment subjects to the claims of a creditor only a debt which, at the time of the garnishment, was due to the underlying debtor."Hospital of St. Raphael v. New Haven Savings Bank, supra, 205 Conn. 608. The question is therefore whether American Savings was indebted to Chuck Budz on October 30, 2001, more specifically, whether American Savings was obligated to Chuck Budz on the cashier's checks on the aforementioned date. See id. In the absence of a "continuing outstanding debt" to Chuck Budz, there was nothing to which the PJR order could attach. Id.
General Statutes § 42a-3-104 (g) defines "cashier's check" as "a draft with respect to which the drawer and drawee are the same bank or branches of the same bank." The obligation of the drawer of a cashier's check is stated in General Statutes § 42a-3-412, which provides in relevant part that "[t]he issuer of a . . . cashier's check . . . is obliged to pay the instrument . . . according to its terms at the time it was issued. . . . The obligation is owed to a person entitled to enforce the instrument. . . ." There are three categories of "persons entitled to enforce an instrument": (1) the holder of the instrument, (2) a nonholder in possession of the instrument who has the rights of a holder or (3) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to General Statutes §§ 42a-3-309 or 42a-3-418
(d). General Statutes § 42a-3-301. A "holder" is defined as "the person in possession if the instrument is payable to bearer or, in the case of an instrument payable to an identified person, if the identified person is in possession." General Statutes § 42a-1-201 (20).
These provisions reveal that on October 30, 2001, when the PJR order became effective, American Savings owed no obligation on the cashier's checks to Chuck Budz. This is because § 42a-3-412 states that CT Page 8203-p American Savings' obligation runs only to a "person entitled to enforce" the checks. Chuck Budz was not such a person on October 30, 2001, nor has he been such a person at any time since. He does not fall within the first two categories of "persons entitled to enforce" as he is neither a holder nor in possession of the checks. He does not fall within the third category since the facts of the present case do not entitle him to enforce as a nonpossessor pursuant to § 42a-3-309 or § 42a-3-418
(d). Instead, it is clear that American Savings' obligation on the checks runs to Mohegan, as the holder in possession of the checks, as of the time of Chuck Budz's negotiation of the checks to Mohegan, which negotiation antedated the PJR order. Thus, American Savings' obligations on the cashier's checks did not constitute a "continuing outstanding debt" owing to Chuck Budz on October 30, 2001, to which the PJR order could attach. Hospital of St. Raphael v. New Haven Savings Bank, supra,205 Conn. 608.
The plaintiff and American Savings nonetheless argue that Chuck Budz retained a possessory interest in the cashier's checks by virtue of the fact that he as payee could require American Savings to stop payment on the checks pursuant to General Statutes § 42a-4-403. The court rejects this argument as an incorrect statement of the law.
General Statutes § 42a-4-403 (a) provides in relevant part: "A customer or any person authorized to draw on the account if there is more than one person may stop payment of any item drawn on the customer'saccount or close the account by an order to the bank describing the item or account with reasonable certainty received at a time and in a manner that affords the bank a reasonable opportunity to act on it before any action by the bank with respect to the item described in section42a-4-303." (Emphasis added.) As previously mentioned, "[a] cashier's check is . . . drawn by a bank as drawer upon itself as drawee. . . ."Laurel Bank Trust Co. v. City National Bank of Connecticut,33 Conn. Sup. 641, 644, 365 A.2d 1222 (1976) (Appellate Session); see also General Statutes § 42a-3-104 (g). "Unlike a personal check drawn by a depositor on his own account, bank checks and cashier's checks carry the promise of the bank itself." United States v. Boren, 278 F.3d 911,916 (9th Cir. 2002). "When a customer requests a bank to stop payment of a bank check or a cashier's check, the customer is asking the bank to break the bank's own . . . contract . . . namely, its promise to a holder of the check that the instrument will be paid." (Citation omitted; internal quotation marks omitted.) Id. "Because a bank check is not drawn on the customer's account but rather on the bank's own account, the bank is not required to impair its credit or incur liability by refusing payment for the convenience of the customer." Id., 917. Thus, "[a] cashier's check . . . purchased by a customer whose account is debited in payment for the check is not a check drawn on the customer's account CT Page 8203-q within the meaning of subsection (a) [of § 42a-4-403]; hence, a customer purchasing a cashier's check . . . has no right to stop payment of such a check under subsection (a)." General Statutes Ann. §42a-4-403, official comment 4 (West 2002 Supp.); see also 2 J. White 
R. Summers, Uniform Commercial Code (4th Ed. 1995) § 21-5, p. 390. Further, it makes no difference that the customer in the present case, Chuck Budz, was also the initial payee of the cashier's check, since "a payee or endorsee has no right to stop payment" either. General Statutes Ann. § 42a-4-403, official comment 2 (West 2002 Supp.); see also 2 J. White R. Summers, supra, p. 384.
As the above authorities make clear, Chuck Budz did not have the right to compel American Savings to stop payment on the cashier's checks. Any argument that such a right forms the basis of a possessory interest in the cashier's checks therefore fails. Accordingly, as to the first and second issues raised by American Savings' motion, the court holds that at the time the PJR was ordered, American Savings owed no obligation to Chuck Budz on the cashier's checks. Chuck Budz, having negotiated the checks to Mohegan prior to the issuance of the PJR order, no longer possessed any interest in the checks to which the PJR order could attach. As such, the PJR order by itself poses no impediment to American Savings' honoring of the checks.
 B Liability of American Savings for Refusal to Pay 1 Parties' Positions
American Savings' motion further requests a determination of whether, by failing to issue payment on the cashier's checks to Mohegan, American Savings would incur liability to Mohegan. Mohegan asserts that it is a holder in due course pursuant to General Statutes § 42a-3-302,[5]
and thus took the checks free and clear of any material claims or defenses advanced by the plaintiff and American Savings.
Mohegan's status as a holder in due course is not disputed by any party. The plaintiff and American Savings argue, however, that a valid defense exists to American Savings' obligation on the instruments that is effective even as to a holder in due course. Specifically, they argue that the defense of "illegality of the transaction" as provided in General Statutes § 42a-3-305 (a)(1) (ii)[6] applies to nullify American Savings' obligation to honor the checks. American Savings supports the plaintiffs argument that the "illegality of the transaction" CT Page 8203-r nullifies any obligation it may have to Mohegan and adds that such nullification has as its result "that the $103,000 is within the scope of the PJR order notwithstanding whether Chuck Budz had any interest in the checks. The funds would be held under the garnishment order pending final judgment of the underlying dispute." (American Savings' Memorandum, filed February 27, 2002, p. 15.)
 2 Effect of Defense on PJR Order
The court deals with the latter argument made by American Savings first insofar as it bears on the court's determination in subpart A of this decision that the cashier's checks are not subject to the PJR order. The court interprets this argument as assuming that if American Savings is not liable to Mohegan and thus does not make payment on the checks, then the $103,000 ipso facto becomes subject to the PJR order. As stated previously, the cashier's checks are drawn, not on Chuck Budz's account, but on American Savings' account. The PJR order did not attach any accounts belonging to American Savings but only accounts of Chuck Budz. Thus, the only way for the $103,000 to become subject to the PJR order is if American Savings effectively rescinds the purchase of the cashier's checks and recredits, i.e., "redeposits," the funds used to purchase them back to Chuck Budz's account, thereby subjecting such money to the PJR order. This presents a practical problem, however, since American Savings is no longer in possession of the $103,000 or of any accounts belonging to Chuck Budz for that matter. After receiving notice of the PJR order, American Savings declined to make payment on the cashier's checks and instead placed the $103,000 in a suspense account pending determination of the issues raised by the present motion. While the motion was pending, the parties represent that the Wethersfield police department instituted a criminal investigation into the Budzes' alleged fraudulent activity, pursuant to which the police executed a search and seizure warrant upon American Savings authorizing the seizure of all account records, documents and funds relating to the Budzes, including the $103,000 being held in the suspense account. Thus, the $103,000 as well as any other account funds subject to the PJR order are now in the possession of the town of Wethersfield. preventing American Savings from recrediting Chuck Budz's account. Accordingly, the court reiterates its previous determination that the PJR order did not attach to the cashier's checks or to their proceeds, and this determination remains unchanged regardless of whether American Savings' may assert a defense to payment.
 3 Viability of Asserted Defense[7]
CT Page 8203-s
The "transaction" asserted to be illegal by the plaintiff and American Savings is the purchase of the cashier's checks by Chuck Budz with funds allegedly obtained through fraud and fiduciary misconduct. As an initial matter, the court disagrees with the parties' characterization of the particular defense involved here as "illegality of the transaction." A claim on the part of a bank that its cashier's check was procured by a fraud perpetrated on the bank by the purchaser relating to the consideration used to purchase the cashier's check is more properly characterized as a defense of "fraud in the inducement or procurement" or "lack or failure of consideration." See, e.g., Farmers Merchants StateBank v. Western Bank, 841 F.2d 1433, 1443 (9th Cir. 1987) (defense of fraud asserted where cashier's check induced by fraudulent check-kiting scheme appearing to show sufficient balance in customer's account); HotelRiviera, Inc. v. First National Bank Trust Co. of Oklahoma City,Oklahoma, 768 F.2d 1201, 1202 (10th Cir. 1985) (defense of failure of consideration asserted by bank issuer of cashier's check where discovered that cashier's check paid for by checks forged by and deposited into account of customer-purchaser); TPO, Inc. v. Federal Deposit Ins. Corp.,487 F.2d 131, 136 (3d Cir. 1973) (simple contract defenses of fraud and failure of consideration applicable where bank issued cashier's checks to payee participating in fraudulent scheme to procure checks); FirstRailroad Community Federal Credit Union v. Columbia Count Bank,849 F. Sup. 780, 783 (M.D.Fla. 1994) (defenses of "fraud in the procurement" and "lack of consideration" asserted where customer-purchaser of cashier's checks engaged in check-kiting scheme appearing to show sufficient funds in account); Da Silva v. Sanders, 600 F. Sup. 1008,1009 (D.D.C. 1984) (defenses of fraud and lack of consideration asserted where proceeds of personal check deposited in account and used as consideration for cashier's check later discovered to be stolen or forged).
The proper characterization of the defense asserted in the present case makes a significant difference. "Real defenses are those which go to the existence of the instrument as a binding obligation. . . ." (Internal quotation marks omitted.) First Railroad Community Federal Credit Unionv. Columbia County Bank, supra, 849 F. Sup. 783. Section 42a-3-305 (a) (1) limits real defenses to four circumstances, including "illegality of the transaction." 2 J. White R. Summers, supra, § 17-10, p. 190. "Personal defenses are those defenses that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract. . . . These personal defenses include failure of consideration . . . and fraud in the inducement." (Citation omitted; internal quotation marks omitted.) First Constitution Bank v.Realty Capitol Associates, Superior Court, judicial district of New Haven, Docket No. 304321 (August 18, 1998, Hartmere, J.) (23 CT Page 8203-t Conn.L.Rptr. 12, 13). Generally, a holder in due course takes subject to real defenses but free of personal defenses. 2 J. White R. Summers, supra, p. 190. Thus, while the defense of "illegality of the transaction" may be asserted against a holder in due course; id; neither lack of consideration nor a general defense of fraud is a viable defense against Mohegan in the present case. Cadle Co. v. Ginsburg, 51 Conn. App. 392,403-04, 721 A.2d 1246 (1998), cert. denied, 247 Conn. 963, 724 A.2d 1125
(1999).
The foregoing analysis leads to the inescapable conclusion that Mohegan, undisputedly a holder in due course, took the cashier's checks free of the asserted personal defenses of fraud in the procurement and/or lack or failure of consideration. Having presented the cashier's checks to American Savings, Mohegan was entitled to payment on them.
In so holding, the court has not ignored the plaintiffs compelling policy and equity appeal that requiring American Savings to pay the checks negotiated by Chuck Budz would be to allow him to benefit from his theft. (Plaintiffs Memorandum, filed February 13, 2002, p. 7.) The court is also confronted, however, by competing principles of public policy that support the circulation and credit of negotiable instruments, particularly cashier's checks. "Cashier's checks have always played a significant role in commercial practices." Da Silva v. Sanders, supra,600 F. Sup. 1013. "[A] cashier's check . . . engages the bank's own credit and is therefore more of a substitute for cash than is an ordinary personal check." Hospital of St. Raphael v. New Haven Savings Bank, supra, 205 Conn. 611. "In effect the bank becomes a guarantor of the value of the check and pledges its resources to the payment of the amount represented upon presentation. To allow the bank to stop payment on such an instrument would be inconsistent with the representation it makes in issuing the check. Such a rule would undermine the public confidence in the bank and its checks and thereby deprive the cashier's check of the essential incident which makes it useful." (Internal quotation marks omitted.) Da Silva v. Sanders, supra, 1013.
Further, "[e]quity also requires the bank to honor its cashier's checks with respect to innocent third parties." Id., 1014. It bears emphasis that Mohegan is no less of an innocent party to the alleged fraud perpetrated by the Budzes in the present case than American Savings. "Between two innocent parties, equity casts the loss upon the party who has [most] trusted the [party] through whom the loss came. . . ." Id. "This is especially true when, as here, the endorsee obtains the issuing bank's verification of the check prior to its unconditional acceptance and the endorsee's change of position." Hotel Riviera, Inc. v. FirstNational Bank Trust Co. of Oklahoma City, Oklahoma, supra, 768 F.2d 1203 n. 2. Mohegan represents that it called American Savings prior to CT Page 8203-u permitting the negotiation of each check and was informed by American Savings each time that no stops or holds had been placed on the checks. (Mohegan's Memorandum, dated February 27, 2002, p. 10.) Thus, policy and equity dictate that as between American Savings and Mohegan, Mohegan should not be the party to bear the loss.
 IV CONCLUSION
In sum, this court holds that neither the court's October 30, 2001 PJR order nor any asserted defense is sufficient to justify American Savings' failure to make payment on the cashier's checks to Mohegan. On a final note, the court is mindful that the Wethersfield police department's seizure of the $103,000 has raised the issue of whether American Savings must nonetheless presently honor its cashier's checks notwithstanding the seizure of the $103,000. The parties have not argued or briefed this issue, and therefore the court will not address it. In fact, Mohegan, as the party most likely to make such an argument, has seemingly conceded without argument or citation to authority that due to the seizure of the suspense account American Savings presently cannot make any such disposition of the funds. (Mohegan's Memorandum, filed February 27, 2002, p. 2.) Due to this concession by Mohegan, the court will not speculate as to whether Mohegan will still presently press for payment given the seizure of the funds. Similarly, the court will not speculate as to whether American Savings will refuse payment due to this fact. Instead, the court deems it more prudent to give the parties the opportunity to reevaluate their respective positions with the goal of settling any differences as to this issue without court involvement.
 ___________________ Hennessey, J.